ACCEPTED
15-25-00020-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/6/2025 4:37 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00020-CV**

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/6/2025 4:37:21 PM
CHRISTOPHER A. PRINE
Clerk

STORABLE, INC.; REDNOVA LABS, INC. (D/B/A STOREDGE); SITELINK
SOFTWARE, LLC; EASY STORAGE SOLUTIONS, LLC; BADER CO.; AND
PROPERTY FIRST GROUP, LP,
*Appellants,*

*V.*

SAFELEASE INSURANCE SERVICES, LLC,
*Appellee.*

*On Appeal from the*
*Third Division of the Texas Business Court*

## BRIEF FOR APPELLEE

JUDD E. STONE II
 State Bar No. 24076720
CHRISTOPHER D. HILTON
MICHAL R. ABRAMS
CODY C. COLL
ALEXANDER M. DVORSCAK
**STONE HILTON PLLC**
600 Congress Ave., Suite 2350
Austin, Texas 78701
judd@stonehilton.com
(737) 465-7248

*Counsel for Appellee*

**IDENTITY OF PARTIES AND COUNSEL**

**Appellants:**
Defendants Storable, Inc.; RedNova Labs, Inc. (d/b/a storEdge); SiteLink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP.

**Appellate and Trial Counsel for Appellants:**
Dale Wainwright (lead counsel)
  dale.wainwright@gtlaw.com
Justin Bernstein
  justin.bernstein@gtlaw.com
**GREENBERG TRAURIG LLP**
300 West 6th Street, Suite 2050
Austin, Texas 78701
(512) 320-7200

Ray T. Torgerson
  rtorgerson@porterhedges.com
Jonna N. Summers
  jsummers@porterhedges.com
Elizabeth "Liza" Eoff
  leoff@porterhedges.com
Lakshmi N. Kumar
  lkumar@porterhedges.com
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000

Katherine G. Treistman
  katherine.treistman@arnoldporter.com
Andrew D. Bergman
  andrew.bergman@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002
(713) 576-2400

**Appellee:**

Plaintiff SafeLease Insurance Services, LLC.

**Appellate and Trial Counsel for Appellee:**

Judd E. Stone II (lead counsel)
  judd@stonehilton.com
Christopher D. Hilton
  chris@stonehilton.com
Michael R. Abrams
  michael@stonehilton.com
Cody C. Coll
  cody@stonehilton.com
Alexander M. Dvorscak
  alex@stonehilton.com
**STONE HILTON PLLC**
600 Congress Ave., Suite 2350
Austin, Texas 78701
(737) 465-3897

R. Paul Yetter
  pyetter@yettercoleman.com
Susanna R. Allen
  sallen@yettercoleman.com
Luke A. Schamel
  lschamel@yettercoleman.com
Shannon N. Smith
  ssmith@yettercoleman.com
Julia Risley
  jrisley@yettercoleman.com
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

Adam T. Locke
  adam@lockelaw.com
**LOCKELAW PLLC**
2617 Bissonnet Street, Suite 503
Houston, Texas 77005
(713) 832-0243

ii

TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................. i

Table of Contents ................................................................................. iii

Index of Authorities ............................................................................... v

Record References ................................................................................. xi

Statement of the Case .......................................................................... xii

Statement Regarding Oral Argument ................................................... xiii

Issues Presented ................................................................................. xiv

Introduction ......................................................................................... 1

Statement of Facts ................................................................................ 5

I.     SafeLease Sued Defendants for Their Predatory Practices. ........... 5

    A.    SafeLease was founded to provide low-price tenant insurance to self-storage facilities. ................................................................ 5

    B.    Defendants are dominant in the FMS market and compete with SafeLease in the tenant-insurance market. .............................. 7

    C.    SafeLease operates within Defendants' Terms of Service. ......... 8

    D.    SafeLease's user access methods are safe; Defendants falsely blame a crash on SafeLease. ............................................... 10

    E.    Defendants insisted on punishing API access fees. ................. 12

    F.    Defendants acted to destroy their competitor SafeLease. ........ 13

    G.    The District Court enters and extends a TRO before denying a temporary injunction. ........................................................ 14

    H.    When the TRO expired, Defendants expanded their blockade. 14

    I.    Without FMS access, SafeLease could not service its contracts, losing customers and risking its reputation. ........................... 15

II.    SafeLease Removed This Action to Business Court. ..................... 18

Summary of the Argument .................................................................. 19

Standard of Review ............................................................................ 23

Argument ........................................................................................... 24

I.      This Court Lacks Jurisdiction to Review the Remand Decision...24

II.     SafeLease's Removal Was Timely and Proper. ...........................29

    A.      SafeLease timely removed the action within thirty days of commencing that action..........................................................29

        1.      Plain language confirms the Business Court's analysis. .....30

        2.      The impractical, ahistorical nature of Defendants' interpretation underscores its textual flaws. .......................36

    B.      Defendants' forum-shopping concerns are misplaced..............43

III.    SafeLease Was Entitled to Injunctive Relief. ...............................47

    A.      SafeLease established a probable right to recover on its tortious-interference claim......................................................48

        1.      The Court should disregard Defendants' affirmative defense at this stage. ...................................................................49

        2.      The justification defense fails as a matter of law.................51

        3.      Defendants' contract-rights theory fails in any case............54

        4.      Defendants cannot prevail on a mere good-faith assertion of a colorable right...................................................................64

    B.      The Business Court did not abuse its discretion in finding irreparable injury. ...................................................................66

        1.      Defendants ignore multiple grounds supporting the Business Court's findings. ................................................................67

        2.      Defendants fail to show any abuse of discretion in finding that SafeLease faced irreparable injury. .............................70

IV.     Defendants' Remaining Arguments Fail.......................................78

    A.      The Business Court correctly rejected Defendants' unclean-hands defense...........................................................................78

    B.      The temporary injunction is prohibitive, not mandatory. ........81

Prayer.....................................................................................................82

Certificate of Service ............................................................................84

Certificate of Compliance .....................................................................84

# INDEX OF AUTHORITIES

## Cases

*101 Lexington Tower, LLC v. 830 N. St. Mary's Hotel, Ltd.*,
678 S.W.3d 291 (Tex. App.—San Antonio 2023, no pet.).........24, 54, 65

*Abbott v. Harris County*,
672 S.W.3d 1 (Tex. 2023)....................................................................48

*Bellamy v. Allegiance Benefit Plan Mgmt., Inc.*,
696 S.W.3d 751 (Tex. App.—Eastland 2024, no pet.) .........................47

*Belser v. St. Paul Fire & Marine Ins. Co.*,
965 F.2d 5 (5th Cir. 1992) ..................................................................28

*Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*,
603 S.W.3d 385 (Tex. 2020)................................................................24

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002).............................................23, 48, 65, 75

*Camp Mystic, Inc. v. Eastland*,
399 S.W.3d 266 (Tex. App.—San Antonio 2012, no pet.).........71, 72, 74

*Canadian Helicopters Ltd. v. Wittig*,
876 S.W.2d 304 (Tex. 1994)...............................................................74

*Cantu v. Guerra & Moore, LLP*,
448 S.W.3d 485 (Tex. App.—San Antonio 2014, pet. denied) .............79

*Carver v. Att'y Gen.*,
No. 15-24-00072-CV, 2025 WL 353105 (Tex. App.—Austin [15th
Dist.] Jan. 30, 2025, no pet.) .......................................................23, 38

*Choctaw Constr. Servs. LLC v. Rail-Life R.R. Servs., LLC*,
617 S.W.3d 143 (Tex. App.—Houston [1st Dist.] 2020, no pet.)..........51

*CMH Homes v. Perez*,
340 S.W.3d 444 (Tex. 2011)...............................................................25

*Combs v. Ent. Publ'ns, Inc.*,
292 S.W.3d 712 (Tex. App.—Austin [3rd Dist.] 2009, no pet.)......47, 48

*Crowley ISD v. Stoneham*,
No. 15-24-00051-CV, 2025 WL 794046 (Tex. App.—Austin [15th
Dist.] Mar. 13, 2025, no pet.) ............................................................39

*DeSantis v. Wackenhut Corp.*,
   793 S.W.2d 670 (Tex. 1990)......................................................48

*DeVillbiss v. West*,
   600 S.W.2d 767 (Tex. 1980)......................................................50

*Edwards v. Mid-Continent Off. Distribs., L.P.*,
   252 S.W.3d 833 (Tex. App.—Dallas 2008, pet. denied) .............. passim

*ETC Field Servs., LLC v. Tema Oil & Gas Co.*,
   710 S.W.3d 379 (Tex. App.—Austin [15th Dist.] 2025, no pet.)....24, 25

*Florie v. Reinhart*,
   No. 01-16-00603-CV, 2017 WL 817166 (Tex. App.—Houston [1st
   Dist.] Mar. 2, 2017, no pet.) ...................................................68

*Fruehauf Corp. v. Carillo*,
   848 S.W.2d 83 (Tex. 1993)........................................................47

*Fuel 2 Go, LLC v. Mesa Fortune, Inc.*,
   No. 01-21-00546-CV, 2023 WL 7029564 (Tex. App.—Houston [1st
   Dist.] Oct. 26, 2023, no pet.)...................................................50

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck
   Drivers Loc. No. 70*,
   415 U.S. 423 (1974) ................................................................44

*Grossman v. City of El Paso*,
   642 S.W.3d 85 (Tex. App.—El Paso 2021, pet. dism'd)........................50

*GTE Mobilnet of S. Tex. Ltd. v. Cellular Max, Inc.*,
   123 S.W.3d 801 (Tex. App.—Beaumont 2003, pet. dism'd) .................77

*Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*,
   690 S.W.3d 32 (Tex. 2024)........................................................67

*Henry v. Cox*,
   520 S.W.3d 28 (Tex. 2017)........................................................23

*Hyde v. Aero Valley Prop. Owners Ass'n*,
   No. 02-20-00416-CV, 2021 WL 2460799 (Tex. App.—Fort Worth
   June 17, 2021, no pet.) ...........................................................50

*In re Berryman*,
   629 S.W.3d 453 (Tex. App.—Tyler 2020, no pet.) .............................26

*In re Christus Santa Rosa Healthcare Corp.*,
617 S.W.3d 586 (Tex. App.—San Antonio 2020, no pet.) ..................... 26

*In re County of Hidalgo*,
655 S.W.3d 44 (Tex. App.—Corpus Christi 2022, no pet.) .................. 45

*In re ETC Field Servs., LLC*,
707 S.W.3d 924 (Tex. App.—Austin [15th Dist.] 2025, no pet.) .. passim

*In re M.A.S.*,
233 S.W.3d 915 (Tex. App.—Dallas 2007, pet. denied) ....................... 68

*In re MetroPCS Commcn's, Inc.*,
391 S.W.3d 329 (Tex. App.—Dallas 2013, no pet.) ............................. 40

*In re Sanofi-Aventis U.S., LLC*,
No. 15-24-00104-CV, 2025 WL 920111 (Tex. App.—Austin [15th
Dist.] Mar. 27, 2025, no pet.) ................................................. 30, 31, 34

*In re Strickland*,
703 S.W.3d 841 (Tex. App.—Austin [3rd Dist.] 2024, no pet.) ............ 25

*In re TXNB Internal Case*,
483 F.3d 292 (5th Cir. 2007) ............................................................ 28

*Intercontinental Terminals Co. v. Vopak N. Am., Inc.*,
354 S.W.3d 887 (Tex. App.—Houston [1st Dist.] 2011, no pet.) .......... 69

*Jackson v. SOAH*,
351 S.W.3d 290 (Tex. 2011) .............................................................. 38

*Jelinek v. Casas*,
328 S.W.3d 526 (Tex. 2010) .............................................. 26, 50, 68, 81

*Kelley v. Homminga*,
706 S.W.3d 829 (Tex. 2025) .............................................................. 46

*Kim v. Ramos*,
632 S.W.3d 258 (Tex. App.—Houston [1st Dist.] 2021, no pet.) .......... 23

*Knox v. Taylor*,
992 S.W.2d 40 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ... 49, 51

*Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc.*,
49 S.W.3d 544 (Tex. App.—Austin [3rd Dist.] 2001, pet. dism'd) . 51, 52

*Letson v. Barnes*,
979 S.W.2d 414 (Tex. App.—Amarillo 1998, pet. denied) ................... 27

*Magellan Terminal Holdings v. Vargas,*
No. 13-19-00354-CV, 2021 WL 79351 (Tex. App.—Corpus Christi Jan. 7, 2021, no pet.) ......................................................................50

*Malouf v. State ex rels. Ellis,*
694 S.W.3d 712 (Tex. 2024) .............................................................30

*Marcus Cable Assocs., L.P. v. Krohn,*
90 S.W.3d 697 (Tex. 2002) ...............................................................55

*Martin v. Dosohs I, Ltd.,*
2 S.W.3d 350 (Tex. App.—San Antonio 1999, pet. denied) ................49

*Morath v. Kingsville ISD,*
710 S.W.3d 918 (Tex. App.—Austin [15th Dist.] 2025, no pet.) ..........27

*Nath v. Tex. Children's Hosp.,*
446 S.W.3d 355 (Tex. 2014) .............................................................40

*Nguyen v. Watts,*
605 S.W.3d 761 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) ..31, 39

*Pipes v. Hemingway,*
358 S.W.3d 438 (Tex. App.—Dallas 2012, no pet.) .............................49

*Poland v. Ott,*
No. 01-07-00199-CV, 2008 WL 257382 (Tex. App.—Houston [1st Dist.] Jan. 31, 2008, no pet.) ...........................................................32

*Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.,*
29 S.W.3d 74 (Tex. 2000) .......................................................... passim

*RenewData Corp. v. Strickler,*
No. 03-05-00273-CV, 2006 WL 504998 (Tex. App.—Austin [3rd Dist.] Mar. 3, 2006, no pet.) ..............................................................69

*Sonwalkar v. St. Luke's Sugar Land P'ship,*
394 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ..........47

*T.R.E.C. v. Marla Nunally Kaufman Homes, LLC,*
No. 15-24-00030-CV, 2025 WL 409504 (Tex. App.—Austin [15th Dist.] Feb. 6, 2025, no pet.) ............................................................31

*Tellez v. City of Socorro,*
226 S.W.3d 413 (Tex. 2007) .............................................................28

*Tex. Health Huguley, Inc. v. Jones*,
  637 S.W.3d 202 (Tex. App.—Fort Worth 2021, no pet.) ....................... 81

*Tri-Star Petroleum Co. v. Tipperary Corp.*,
  101 S.W.3d 583 (Tex. App.—El Paso 2003, pet. denied) ..................... 82

*Truly v. Austin*,
  744 S.W.2d 934(Tex. 1988) ................................................................. 80

*U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*,
  681 S.W.3d 383 (Tex. 2023) ................................................................. 38

*Universal Healthcare Servs., Inc. v. Thompson*,
  24 S.W.3d 570 (Tex. App.—Austin [3rd Dist.] 2000, no pet.) ............. 82

*Watts v. Alto ISD*,
  537 S.W.2d 776 (Tex. App.—Tyler 1976, no writ) .............................. 48

*Williams v. Norwest Bank Mt.*,
  No. 09-99-096 CV, 1999 WL 651072 (Tex. App.—Beaumont Aug.
  26, 1999, no pet.) ................................................................................. 50

*Wynne v. Fischer*,
  809 S.W.2d 264 (Tex. App.—Dallas 1991, writ denied) ...................... 79

*Yilmaz v. McGregor*,
  265 S.W.3d 631 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) ... 32

*Young Gi Kim v. Ick Soo Oh*,
  No. 05-19-00947-CV, 2020 WL 2315854 (Tex. App.—Dallas May
  11, 2020, no pet.) ................................................................................. 50

*Zachry Eng'g Corp. v. Encina Dev. Grp.*,
  672 S.W.3d 534 (Tex. App.—Houston [14th Dist.] 2023, pet.
  abated) ................................................................................................. 33

## Statutes

28 U.S.C. § 1446(b) ................................................................................. 40

28 U.S.C. § 1450 ...................................................................................... 43

TEX. BUS. & COM. CODE § 324.002 ......................................................... 62

TEX. BUS. & COM. CODE § 324.051 ......................................................... 62

TEX. BUS. & COM. CODE § 324.055 ......................................................... 62

TEX. CIV. PRAC. & REM. CODE § 10.001 ...................................................39

TEX. CIV. PRAC. & REM. CODE § 16.004 ...................................................36

TEX. CIV. PRAC. & REM. CODE § 51.014 ...................................................44

TEX. GOV'T CODE § 25A.004 ...........................................................27, 37

TEX. GOV'T CODE § 25A.004(d)(1), (2).......................................................33

TEX. GOV'T CODE § 25A.006 ...........................................27, 28, 37, 40

TEX. GOV'T CODE § 25A.006(a)..................................................................34

TEX. GOV'T CODE § 25A.006(f) ........................................................ passim

TEX. GOV'T CODE § 25A.006(f)(1) .............................................................28

TEX. GOV'T CODE § 25A.006(f)(2) .......................................................38, 43

TEX. GOV'T CODE § 25A.007 ...........................................................30, 37

TEX. GOV'T CODE § 25A.016 ...........................................................30, 37

TEX. GOV'T CODE § 311.011(b) ..................................................................31

## Other Authorities

38 TEX. JUR. 3d § 232.................................................................................25

50 TEX. JUR. 3d § 51..................................................................................37

BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE 991 (4th ed.
   2016).................................................................................................34

Jack B. DiSorbo, *A Primer on the Texas Business Court,*
   76 Baylor L.R. 360 (2024).................................................................40

KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129
   (5th ed.1984) ...................................................................................50

## Rules

TEX. R. CIV. P. 22....................................................................................32

TEX. R. CIV. P. 355..................................................................................42

TEX. R. CIV. P. 682..................................................................................39

TEX. R. CIV. P. 94....................................................................................48

## RECORD REFERENCES

"CR" refers to the single-volume Clerk's Record. "CSR" refers to the single-volume Clerk's Supplemental Record. The Business Court Reporter's Record consists of seven volumes. Testimony contained in volumes three through five of the Business Court Reporter's Record are cited as "BC[volume]RR[page(s)]." Plaintiff's and Defendants' exhibits, contained within volume seven of the Reporter's Record, are cited as "PX[number]" and "DX[number]," respectively. The District Court Reporter's Record is cited as "DC[volume]RR[page(s)]."

# STATEMENT OF THE CASE

*Nature of the Case*:     This is an interlocutory appeal from a temporary injunction issued to preserve the status quo while the parties litigate claims that Defendants violated the Texas Antitrust Act and tortiously interfered with Plaintiff's contracts and prospective business relations.

*Course of Proceedings*:     Plaintiff originally filed this action in a Travis County district court. CR0026. That court denied a temporary injunction, CR0306, after which Plaintiff removed the action—within 30 days of commencing it—to Business Court, CR0005. Defendants moved to remand the case, CR0488, while Plaintiff applied for temporary injunctive relief and for reconsideration of the district court's denial, CR0361.

*Trial Court*:     Third Division of the Texas Business Court, The Honorable Melissa Andrews.

*Trial Court Disposition*:     Following a four-day hearing that included three days of evidence, the Business Court granted Plaintiff's application for temporary injunctive relief. CR0927. That court also denied Defendants' motion to remand the case to the district court. CR0747.

## STATEMENT REGARDING ORAL ARGUMENT

Appellee respectfully submits that this Court can affirm the temporary injunction without argument. Oral argument would not materially aid this Court's resolution of this routine, fact-bound discretionary decision to grant temporary injunctive relief upon detailed factfinding after a four-day evidentiary hearing. Nor does Appellants' jurisdictional challenge merit argument given its total lack of textual support. If, however, the Court determines that oral argument would aid its resolution of the issues presented, Appellee respectfully requests the opportunity to participate.

# Issues Presented

The issues presented are:

I.      Whether this Court has jurisdiction to review the Business Court's denial of Defendants' Motion to Remand even though no statute authorizes interlocutory review of that decision and Defendants have not requested or briefed mandamus relief.

II.      Whether the Business Court erred in denying remand of this case when SafeLease timely filed its notice of removal within 30 days of the commencement of the action in district court.

III.      Whether the Business Court abused its discretion in ordering temporary injunctive relief when SafeLease showed that it was likely to succeed on its tortious interference claim and proved an imminent irreparable injury.

IV.      Whether Defendants have shown SafeLease has "unclean hands" to justify reversal of the temporary injunction even though the Business Court considered and rejected that argument and Defendants do not carry the high burden to show that was an abuse of discretion.

V.      Whether Defendants preserved a challenge to the temporary injunction as mandatory versus prohibitive when they never raised such an argument below.

The Court should answer each in the negative and therefore affirm the Business Court's decision.

## INTRODUCTION

Customers love low prices. SafeLease's customers certainly do; based in Austin, SafeLease is the premiere low-price provider of insurance for self-storage tenants in Texas and nationwide. SafeLease's best-in-class prices and excellent customer service have predictably led to steady growth and high customer satisfaction. SafeLease offers its insurance products—consistent with its contractual and regulatory obligations—by directly accessing storage facilities' management software, which facility operators provide.

Competitors hate low prices. Defendants want to offer higher-priced insurance products in SafeLease's market. They possess a monopoly in the upstream facility-management software ("FMS") market, holding greater than 80% of the market share. Disinclined to compete with lower-cost products in the tenant-insurance market, Defendants aggressively target their competitors for acquisition, elimination, or in SafeLease's case, both.

SafeLease and its successful business model almost immediately caught the attention of Defendants' CEO, who heard that "there were customers out there who liked what [SafeLease was] doing." BC5RR179.

1

He "decided that SafeLease was doing something interesting and compelling," which "was good for operators because it encouraged more tenants to get coverage"; "good for tenants because having coverage over your stored goods . . . is a good thing"; and "good for the industry because . . . it encouraged more insurance protection in the self-storage industry." BC5RR179-80. So "[m]ore than once" he talked with SafeLease's CEO about Defendants "acquiring SafeLease," including just a few weeks before this suit began. BC5RR180.

SafeLease rebuffed Defendants' acquisition overtures. Despite Defendants' efforts, SafeLease has made considerable inroads, winning insurance customers from Defendants by offering customers what they want most: competitive products at better prices.

Like many monopolists, Defendants see price competition as an existential threat. Defendants promptly went on the attack, abruptly blocking SafeLease's authorized access to Defendants' FMS systems— critical access SafeLease needs to serve its customers. This harmed SafeLease and customers, who rely on SafeLease's contractual tenant-insurance services to manage hundreds of millions of dollars of risk. Defendants' actions were calculated to cripple SafeLease and force

customers to switch to Defendants' less-popular, higher-price insurance products.

Faced with Defendants' attempt to drive them from the market, SafeLease sought a temporary injunction to preserve the status quo—beginning in district court and removing to Business Court. After a four-day hearing with more than 400 exhibits and nine witnesses—including three experts and each side's CEOs—the Business Court granted the injunction. It found the "evidence shows that SafeLease has a probable right to relief on its claims for tortious interference with valid, existing SafeLease contracts." CSR041. And that "Defendants intentionally interfere with existing SafeLease customer contracts through exclusionary, anticompetitive, or otherwise wrongful means," which included:

- "blocking SafeLease from accessing customer-owned data" in "their licensed FMS systems—a marked change from Defendants' past practices";

- "using their position in the FMS market to prevent and impede SafeLease from providing services to customers"; and

- "making false or misleading representations about SafeLease to mutual customers regarding misuse of sensitive customer data, use of malicious code and processes, and the risks to cybersecurity."

CSR042.

3

Defendants tried to justify their actions. The Business Court heard this evidence, including testimony from Defendants' CEO, but found it "was not credible, and SafeLease's controverting evidence was credible." CSR042. The Business Court held the "evidence failed to show that SafeLease":

- "misused or improperly disclosed customer data";

- "used spybots, engaged in hacking, or introduced or attempted to introduce malicious code or viruses";

- "overloaded Defendants' FMS system . . . or otherwise interfered with or interrupted the performance or integrity of the FMS system";

- "accessed customer data in a manner not authorized by the customer"; or

- "materially increased the risk of a security breach."

CSR042. And it held that the evidence *did* show that "Defendants' actions are *not* motivated by any alleged breach of their Terms of Service." CSR044 (emphasis added). Although Defendants "attempt to distinguish accountants [and similar vendors], as authorized users, from insurance providers (like SafeLease), as authorized users, based on the extent of use," the "Terms of Service do not draw such a distinction." *Id.*

Defendants mysteriously ignore nearly all these findings—to say nothing of their dogged refusal to acknowledge, let alone carry, the heavy

4

burden of showing that the Business Court abused its discretion. Their failure to even acknowledge the substantial evidence supporting the injunction is fatal to their appeal. Instead, Defendants commit nearly half their brief to a question over which this Court lacks jurisdiction: whether this case was properly removed. And what it offers on jurisdiction flouts the statute's plain text; lacking better, Defendants spend dozens of pages bemoaning the Legislature's decision to permit plaintiffs and defendants to remove cases to Business Court. This case presents a rare trifecta: Defendants manage to fatally err on jurisdiction, the contents of the record, and the meaning of the governing statute. This Court should accordingly affirm.

## STATEMENT OF FACTS

### I.  SafeLease Sued Defendants for Their Predatory Practices.

#### A.  SafeLease was founded to provide low-price tenant insurance to self-storage facilities.

There are more than 52,000 self-storage facilities in America. PX36-002. The nearly $50 billion industry largely comprises owner-operators that lease storage space, usually month-to-month. *Id.* And self-storage is big business in Texas. In 2023, Texas had more than 10% of all facilities

5

nationwide, and the amount of rentable self-storage space in Texas is 256 million square feet, among the highest per capita. PX35-019.

SafeLease was founded in 2021 to provide low-price tenant insurance and tenant protection plans. BC3RR286; BC3RR289. SafeLease is based in Texas, its biggest market. BC5RR26-27. SafeLease's superior prices and better customer service led to rapid growth. BC3RR291-93. SafeLease now provides coverage to some 2,600 facilities covering hundreds of thousands of units. BC5RR13, BC5RR28. SafeLease, as an insurer, is heavily regulated and has strict legal obligations, including required notices to insureds and timely resolution of claims. BC5RR19-20.

While some large public self-storage companies—like Public Storage, CubeSmart, and U-Haul—offer their own insurance programs and use their own proprietary management software, PX35-24; PX36-5; BC5RR170-71, most self-storage facilities are owned and operated by small- and medium-sized businesses, PX35-025-26. These facilities rely on third-party vendors for their FMS and tenant-insurance plans. BC3RR214-15.

**B. Defendants are dominant in the FMS market and compete with SafeLease in the tenant-insurance market.**

Defendants are the "10,000-pound gorilla," BC4RR257, in the FMS market. An FMS platform is routinely accessed by the facility, its employees, and vendors, and is indispensable to running the business. BC3RR214-15. Among independent self-storage facilities, Defendants possess 82% of the market. BC3RR121. Even when including the large, public self-storage companies (who have their own FMS and insurance products), Defendants still retain a 69% market share. BC3RR121-22. To establish market dominance, Defendants gained this monopolistic market share by deploying private-equity capital to purchase and "roll up" various third-party vendors. They did this both in the FMS market and in related markets, such as insurance. BC5RR169-170; PX1.

Given Defendants' FMS dominance, it is unsurprising that SafeLease services ████████████████████ 1,800 facilities that use Defendants' FMS platforms. BC5RR28; PX63. Facility owners pay Defendants for FMS services and grant SafeLease authorization to use their FMS and data to administer insurance products. BC5RR98; PX70-2.

7

Defendants also offer insurance products and exert substantially larger market force. BC3RR116; BC5RR27. Recognizing SafeLease's popularity, Defendants have repeatedly attempted to buy SafeLease, including just weeks before this litigation. BC5RR37; BC5RR53-54.

## C. SafeLease operates within Defendants' Terms of Service.

SafeLease customers agree to provide it with administrator access to their FMS accounts. BC5RR29; PX70-2. Tenant data accessible from a facility's account is owned by the facility—SafeLease and Defendants' mutual customer—and "Storable has never questioned" this ownership. BC3RR266-67; BC5RR102. In exchange for this access, SafeLease administers the insurance product using the facility's data. BC3RR282.

This data is safe and secure. SafeLease uses independently audited SOC-2-certified security processes, the industry gold standard. BC5RR32; PX48. The information that SafeLease accesses is limited to what its customers and their users can see. BC5RR268. That means SafeLease cannot access, for example, ███████████████████ BC3RR218; BC5RR30. SafeLease accesses this data to perform its contracted functions. BC3RR229-30. The operator of mutual customer MyStorage.com, Gregory Rudkin, confirmed that the facility gives

8

SafeLease access to its data to perform contracted functions on its behalf. BC3RR229-30.

Defendants' Terms of Service expressly allow its customers to grant FMS access to third-party contractors and vendors like SafeLease. For storEDGE and SiteLink (two of Defendants' FMS platforms), SafeLease falls squarely within the terms' definition of "User," which includes the facility's "employees, consultants, contractors and agents, and third parties with which you transact business." DX2-2-3; DX3-2. Both FMSs permit a customer to designate "as many" Authorized Users "as you wish." DX2-6; DX3-6.

Accordingly, when SafeLease has a customer using one of Defendants' FMS platform, the facility creates account credentials for SafeLease as it would for store managers. BC3RR294; BC5RR33. Defendants' customers routinely designate outside vendors as authorized users, including third-party operators, marketers, and accountants. BC3RR205; BC3RR215-16. For example, Rudkin creates credentials for third-party accountants to access SiteLink. BC3RR283-84. Storable's CEO confirmed that third-party vendors can access the FMS platforms

as authorized users without API access or contracting with Defendants. BC5RR173-76.

Defendants can see all users' authorized access to customer FMS accounts in their systems, including SafeLease's. BC5RR33. Before this litigation, Defendants neither demanded that SafeLease discontinue authorized user access on behalf of its customers nor told SafeLease that it was violating applicable terms of service. BC5RR33-34.

### D. SafeLease's user access methods are safe; Defendants falsely blame a crash on SafeLease.

For efficiency, SafeLease uses automated tools to pull data and reports from the FMS platform. BC3RR295. Those tools are akin to commonly used features of most consumer web browsers, such as clicking "save my password" instead of entering a password for every login. BC5RR78. And these tools run on SafeLease's systems, not Defendants'. BC5RR269. Although Defendants derogatorily accuse SafeLease of using "bots," technical experts confirmed that term can describe any form of automation, such a password manager, and is not inherently malicious. BC5RR257; BC5RR278-79. SafeLease never "hacked" Defendants' systems or improperly gained access beyond what is available to other authorized users. BC5RR277-78.

███████████████████████████████████████████████████

██████ BC5RR250. ██████████████████████████████████

████████████████████████████████████████ BC5RR250-

51; BC5RR274. ██████████████████████████████████

██████████████████████████████ BC5RR256. SafeLease

fully complied with these rules. BC5RR52-53. Accordingly, Defendants

achieved the desired load reduction in November 2024—but still cut off

SafeLease's system access a month later. BC5RR260.

While Defendants reported no major FMS outages in 2024, they did

report one in January 2025 for their Easy Storage Solutions ("ESS")

platform. BC5RR251-53, PX178. SafeLease was locked out of ESS at the

time, so it could not have caused Defendants' outage. BC5RR276.

Storable's CEO also asserted without evidence that SafeLease caused a

crash of ESS in April 2024—a month for which Defendants' performance

tracker reported "No incidents." BC5RR196; BC5RR252-53; PX178. No

evidence was presented of any other system outages, and storEDGE and

SiteLink have never crashed. BC5RR196-97.

## E. Defendants insisted on punishing API access fees.

In 2024, Defendants decided to stop insurance customers from switching to SafeLease. Defendants leveraged their FMS-market dominance to demand an onerous, non-market access fee from SafeLease.

This was an about-face for Defendants. SafeLease approached Defendants to negotiate terms for API access to SiteLink years ago, but Defendants refused. BC5RR37-38; PX13. Last fall, the parties revisited the idea. BC5RR45; PX40. ███████████████████

████████████████ BC5RR49. While SafeLease offered Defendants $0.45 per unit, Defendants were willing to offer API access only at the extortionate and confiscatory price of $1.00 per unit. BC3RR129; BC5RR50; PX42. Defendants ████████████████

█████████████████████████████████████

████████ BC5RR200-01. For any customer that leaves Defendants for SafeLease, regardless of solicitation, API rates rise to $1.50 per unit, a 50% penalty. BC3RR129; PX42. The penalty has no pro-competitive explanation; its sole purpose is to punish competitors and confiscate profits. *Cf.* BC5RR198-205, 217-21.

Paying $1.00 to $1.50 per unit would make SafeLease lose money on every sale. BC5RR46-47. ███████████████████████████

████████████████████████████████████████████

███████ BC5RR46. One of Defendants' customers, John Manes, owner of Pinnacle Storage Properties, confirmed that if SafeLease must pay the $1.00 or $1.50 per unit price, "the loser would be the customer," BC4RR249, who would pay higher prices. And making every policy a net loss would quickly force SafeLease out of business.

## F. Defendants acted to destroy their competitor SafeLease.

When Defendants' efforts to extract ruinous rents failed, they turned to FMS market dominance to interfere with SafeLease customer contracts. In November 2024, SafeLease engineers found that Defendants had barred SafeLease IP addresses from storEDGE. BC5RR53-54; PX95.

In December 2024, Defendants again offered to buy SafeLease—signaling that SafeLease must sell or face further retaliation. BC5RR54-55. Those efforts culminated with a complete blacklisting of SafeLease from storEDGE on December 17, 2024. BC5RR54; DC2RR166. All @safelease.com usernames were disabled, preventing SafeLease from

servicing tens of thousands of insurance plans. BC5RR53-54. Defendants inhibited SafeLease's ability to obey insurance regulations and created a grave risk of loss for insureds. BC5RR18, 24.

## G. The District Court enters and extends a TRO before denying a temporary injunction.

Facing imminent and irreparable harm without customer-account access, SafeLease applied to the Travis County District Court for an emergency TRO. CR0026. After submission and notice, the court granted that relief on December 31, 2024. CR0062. Defendants restored access within an hour. BC5RR55; PX52. SafeLease's TRO was narrowly tailored and only required Defendants to continue to allow SafeLease to access the FMS systems as an authorized user—the status quo since 2021. CR0026. On January 9, 2025, the court extended the TRO (to allow for expedited discovery), CR0208, and denied Defendants' motion to dissolve the order, CR0211. The court held a temporary injunction hearing on January 16 and denied the application without reasons. CR0367-68.

## H. When the TRO expired, Defendants expanded their blockade.

Defendants immediately escalated their anticompetitive interference. The day after the TRO expired, Defendants resumed

14

blocking storEDGE access. BC5RR13. But they went much further, cutting off access to their other two FMS platforms, increasing the number of affected tenants to 280,000. BC5RR13.

The scope of the restriction also widened. Defendants earlier said they were primarily concerned with SafeLease's automated access and that SafeLease could manually log in to its customers' accounts. DC2RR57; DC2RR279. But after the TRO expired, Defendants would not even allow manual access, erasing all existing SafeLease accounts. BC5RR15. Customers created new accounts for SafeLease to continue providing services. BC5RR13-14. But the new accounts were deactivated almost as quickly as they were created—often before SafeLease used them. BC5RR13-15.

## I. Without FMS access, SafeLease could not service its contracts, losing customers and risking its reputation.

Although SafeLease tried hiring temporary workers to stay afloat, without FMS access it could not confirm insurance coverage, enroll units in insurance, set up new customers, or process opt-outs. BC4RR17-20; BC5RR18. Besides preventing SafeLease from performing core functions it contracted to provide, BC4RR18-19; BC5RR15-16, this created a risk of uninsured losses, BC5RR18. SafeLease's ability to adjust claims was

15

also affected, preventing SafeLease from timely resolving claims. BC4RR20-21; BC5RR24. SafeLease manages hundreds of millions of dollars of risk. BC5RR24. To properly underwrite and price that risk, SafeLease needs FMS access for up-to-date tenant information. BC5RR24-25.

For the tasks that SafeLease has been able to continue performing, the extra work substantially burdens SafeLease's customers. BC3RR222; BC3RR319. And while SafeLease can do some billing if a facility manually emails reports, SafeLease cannot fully carry out its contracted billing functions. BC5RR21. Lack of FMS access also stymies SafeLease's ability to provide notices to tenants—which must come through the FMS, not directly from SafeLease. BC 5RR121-23.

Besides direct operational harm, SafeLease faced reputational risk. BC5RR57. SafeLease's CEO, Steven Stein, testified to the importance of trust in the insurance market and how Defendants harmed SafeLease's goodwill. BC5RR56-57. For example, in December 2024, SafeLease successfully competed for a new customer that uses SiteLink. BC3RR303. However, citing the significant operational challenge and financial risk

posed by Defendants' conduct, the customer canceled their contract just a few weeks later. PX67.

After being locked out of Defendants' FMS, SafeLease lost 12 customers, PX170, representing approximately 15,000 units, between January 21 and February 14, 2025, BC5RR26. Without injunctive relief,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ BC3RR324. SafeLease was continually "putting out fires with customers," and it was "a ticking time bomb" until remaining customers left. BC4RR16.

Defendants made multiple false statements to SafeLease's customers in their bid to drive SafeLease out of the market. On January 28, 2025, Defendants sent an email to all the companies' mutual customers claiming that Defendants blocked SafeLease's FMS access for purported "security" and "privacy" reasons. PX147-002-3. Defendants also falsely told SafeLease's customers that its FMS access violates Defendants' terms of service. PX147-002-3. Defendants encouraged customers to end their relationships with SafeLease and switch to Defendants' insurance or Defendant-partnered vendors. PX147-004.

17

Likewise, Storable's CEO falsely told a mutual customer that SafeLease is "launching *spybots*, which allows for the retrieval of sensitive customer information, including driver licenses, Social Security numbers, and *credit card* numbers." PX208 (emphasis added). He also falsely accused SafeLease of using "unauthorized bots that are illegally logging in the SiteLink system and creating a legal liability of a possibl[e] data breach of customer information." PX168.

## II. SafeLease Removed This Action to Business Court.

Facing imminent and irreparable harm from Defendants' campaign to drive it from the marketplace, SafeLease removed this case to Business Court on January 29, within thirty days of filing in district court. CR0005. SafeLease sought a TRO, but the Business Court denied the request. CR0486.

After briefing, the Business Court denied Defendants' remand motion. CR0747. Yet Defendants did not seek mandamus; they let the matter proceed to a four-day hearing on SafeLease's temporary-injunction application, with hundreds of exhibits offered into evidence. At the hearing, SafeLease explained that Defendants' excalating

"anticompetitive conduct and interference with SafeLease's existing and prospective contracts" necessitated relief. CR0368.

The Court granted a temporary injunction, barring Defendants from "prevent[ing], imped[ing], or otherwise interfere[ing] with SafeLease's authorized-user access to mutual customers' data stored in FMS systems licensed from Defendants . . . as well as SafeLease's use of such data within the processes of the FMS systems," as authorized by and available to consumers. CSR0047.

## SUMMARY OF THE ARGUMENT

**I.** Defendants insist that the Business Court erred in denying remand. But this is not an appeal from the denial of remand; it is an appeal from a temporary injunction. No statute authorizes an interlocutory appeal of the remand denial, which is reviewed before final judgment only through a mandamus petition. Defendants have not requested mandamus, briefed the mandamus standard, or invoked this Court's original jurisdiction. No statutory language suggests that the removal deadline is jurisdictional, so even an untimely removal would not deprive the Business Court of the power to issue an injunction.

19

Defendants' attack on SafeLease's timely, statutorily authorized removal to Business Court is not properly before this Court.

**II.** Nevertheless, SafeLease properly removed this action to Business Court consistent with the Legislature's clear determination that plaintiffs in actions filed in other courts may do so.

**A.** As statutory text makes clear, the removal clock does not start until, at the earliest, an "action" is "commenced" by a "party." The Legislature placed complex business cases within the Business Court's jurisdiction and empowered *both* plaintiffs and defendants to remove to that court. And the Legislature's use of the words "party"—meaning a litigant in an existing civil case—and "action"—meaning an actual, existing court proceeding—show that the Legislature intended the clock to run from the time suit is filed. Defendants' policy-based objections are misdirected.

Defendants' atextual, good-for-Defendants-only reading of the statute would also have the perverse effect of preventing removal for practically all litigants. And Defendants would require the Business Court to undertake intensive evidentiary hearings in the rare case a litigant *might* be able to remove under Defendants' theory. And to top it

off, Defendants' interpretation would render surplusage the statutory provision permitting removal after an order on temporary injunctive relief. These textual inconsistencies require rejecting Defendants' impractical, ahistorical interpretation of the removal provisions.

**B.** Next, Defendants' protests regarding "forum shopping"—which amount to thinly veiled disagreements with the Legislature's policy choices—fail for two reasons. First, neither the statute nor the rule contemplates "forum shopping" as grounds for remand. Texas courts already have a variety of ways to punish abusive litigation behavior. And second, the Legislature expressly permitted a plaintiff to remove a case after a district court denies a temporary injunction—*i.e.*, the Legislature specifically permitted a party to file a case, seek a temporary injunction, and remove that case anyway. Defendants' disagreement with that policy decision is irrelevant.

**III.** The Business Court rightly enjoined Defendants' unlawful and anticompetitive conduct. As that court found, SafeLease demonstrated a probable right to recover on its claim for tortious interference. Defendants' affirmative defense, by contrast, fails as a matter of law and as a matter of fact. SafeLease also demonstrated irreparable harm

21

because Defendants' conduct risks permanently damaging SafeLease's customer relationships, reputation, and goodwill. Defendants' brief does not even mention the term "goodwill" let alone challenge the Business Court's finding of irreparable harm. Defendants' insistence that SafeLease can be made whole through money damages flies in the face of the record and the Business Court's findings. Their arguments fall short of carrying the heavy burden of demonstrating that the Business Court abused its discretion.

**IV.** Defendants' remaining issues change nothing. They argue first that SafeLease had "unclean hands" to receive equitable relief. The Business Court did not abuse its discretion in deciding otherwise. It concluded that Defendants—not SafeLease—acted inequitably and are not credible, and those findings are amply supported.

Finally, Defendants complain that the temporary injunction is mandatory, not prohibitive, despite never raising this issue below. In any event, Defendants offer only a single conclusory sentence that SafeLease did not meet the heightened standard for mandatory injunctions. But even this single sentence is wrong, as the injunction is plainly prohibitive. That Defendants may have to act in some incidental way to

22

comply with an injunction that preserves the status quo does not change the injunction's nature.

## STANDARD OF REVIEW

Courts consider subject-matter jurisdiction and statutory construction *de novo. See Carver v. Att'y Gen.*, No. 15-24-00072-CV, 2025 WL 353105, at \*2 (Tex. App.—Austin [15th Dist.] Jan. 30, 2025, no pet.); *Kim v. Ramos*, 632 S.W.3d 258, 263-64 (Tex. App.—Houston [1st Dist.] 2021, no pet.).

A temporary injunction is reviewed for a "clear abuse of discretion." *Henry v. Cox*, 520 S.W.3d 28, 33 (Tex. 2017). This Court does not "review or decide the underlying merits," *id.*, and cannot "substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion," *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002). Only if the trial court's decision "was so arbitrary that it exceeded the bounds of reasonable discretion" will this Court reverse. *Id.* at 204.

On fact questions, this Court upholds the Business Court's determinations "if some evidence reasonably supports the trial court's decision." *Id.* at 211. Evidence need only be legally sufficient—more than

a scintilla—to support the court's findings. *Edwards v. Mid-Continent Off. Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas 2008, pet. denied). The Court reviews the record in the light most favorable to the trial court's decision, indulging all reasonable inferences in its favor. *101 Lexington Tower, LLC v. 830 N. St. Mary's Hotel, Ltd.*, 678 S.W.3d 291, 296-97 (Tex. App.—San Antonio 2023, no pet.).

**ARGUMENT**

## I. This Court Lacks Jurisdiction to Review the Remand Decision.

The Supreme Court jealously guards the final judgment rule—*i.e.*, that "appellate courts generally only have jurisdiction over final judgments." *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 390 (Tex. 2020). "Statutes authorizing interlocutory appeals 'are a narrow exception to [that] general rule.'" *Id.*

Remand orders, whether granting or denying, are not final judgments. *ETC Field Servs., LLC v. Tema Oil & Gas Co.*, 710 S.W.3d 379, 381 (Tex. App.—Austin [15th Dist.] 2025, no pet.). And as this Court has previously acknowledged, "[n]o statute authorizes an interlocutory appeal of a remand order from the business court." *Id.* at 380. Thus, "review of any remand order can be obtained only by a petition for writ

24

of mandamus." *Id.* at 381; *see also In re ETC Field Servs., LLC*, 707 S.W.3d 924, 925, 928 (Tex. App.—Austin [15th Dist.] 2025, no pet.). Defendants never sought mandamus relief. That ends the matter.

**A.** Defendants waived the right to challenge the remand decision by failing to seek mandamus relief. Mandamus is available when "the relator establishes a clear abuse of discretion for which there is no adequate appellate remedy." *ETC*, 707 S.W.3d at 926. Courts require appellants to expressly request mandamus relief in the alternative and thereby invoke the Court's original jurisdiction. *See CMH Homes v. Perez*, 340 S.W.3d 444, 452-53 (Tex. 2011); *In re Strickland*, 703 S.W.3d 841, 846 (Tex. App.—Austin [3rd Dist.] 2024, no pet.). But Defendants have not done so here. And rather than challenge the remand denial when it happened, they waited until after the parties and court spent significant time and resources on a multi-day evidentiary hearing to raise the issue. Because Defendants make no "bona fide attempt to invoke this Court's [original] jurisdiction," they cannot now seek mandamus. *Strickland*, 703 S.W.3d at 846. The Court should not convert this direct, interlocutory appeal into a mandamus petition.

What's more, Defendants neither reference nor satisfy either mandamus prong. The heightened mandamus standard requires that "the trial court could reasonably have reached only one decision," *In re Christus Santa Rosa Healthcare Corp.*, 617 S.W.3d 586, 590 (Tex. App.—San Antonio 2020, no pet.), and that the trial court committed a "clear and prejudicial error of law," *In re Berryman*, 629 S.W.3d 453, 458 (Tex. App.—Tyler 2020, no pet.). Mandamus "does not lie to correct a trial court's ruling on an unsettled or uncertain question of law." 38 TEX. JUR. 3d § 232. Although the removal statute's plain language is certain, *see* section II.A, *infra*, this Court has not settled its interpretation and mandamus is therefore inappropriate.

Defendants likewise fail to argue an inadequate remedy by appeal from final judgment. Defendants have "waive[d]" any argument on that basis by "fail[ing] to brief" it. *Jelinek v. Casas*, 328 S.W.3d 526, 540 n.10 (Tex. 2010). Thus, even if the Court treated this appeal as a mandamus petition, it should deny mandamus relief. Defendants lack the "case-specific" analysis for that "exceptional" relief. *ETC*, 707 S.W.3d at 929.

**B.** Nor can Defendants manufacture appellate jurisdiction over a removal order by smuggling it into a statutory interlocutory appeal of a temporary injunction.

A temporary-injunction appeal does not "imbue[] the court with jurisdiction to address interlocutory matters outside the scope of section 51.014 of the Texas Civil Practice and Remedies Code." *Letson v. Barnes*, 979 S.W.2d 414, 417 (Tex. App.—Amarillo 1998, pet. denied). Rather, only issues that "affect the validity of the appealable order" are properly before the Court on this posture. *Id.* The timeliness of removal does not impact the Business Court's subject-matter jurisdiction or its authority to act. Statutory deadlines "are presumed to be nonjurisdictional absent clear legislative intent to the contrary." *Morath v. Kingsville ISD*, 710 S.W.3d 918, 924 (Tex. App.—Austin [15th Dist.] 2025, no pet.). The Business Court's jurisdiction statute does not reference removal and never conditions subject-matter jurisdiction over a removed action on the removal's timeliness. *See generally* TEX. GOV'T CODE § 25A.004. Nor does the removal statute itself. *Id.* § 25A.006. The nonjurisdictional presumption therefore holds.

That practice comports with federal practice, after which the Business Courts' removal procedure is patterned. Federal courts understand removal timelines as procedural, not jurisdictional. *In re TXNB Internal Case*, 483 F.3d 292, 299 (5th Cir. 2007); *Belser v. St. Paul Fire & Marine Ins. Co.*, 965 F.2d 5, 8 (5th Cir. 1992). The same should hold here. Most procedural defects do not affect a court's power to hear and decide an action. *See, e.g., Tellez v. City of Socorro*, 226 S.W.3d 413, 414 (Tex. 2007). "[*J*]*urisdiction* exists" when a case falls within the Legislature's grant of authority to the Business Court; removal is merely the "*procedure* by which" a case can be transferred to the Business Court. *See id.* (citation omitted); *ETC*, 707 S.W.3d at 927 (removal merely "transfers an existing [civil action]").

And because the timeliness of removal carries no jurisdictional consequences, it cannot affect the "validity" of the temporary injunction. Defendants therefore cannot piggyback an issue over which this Court lacks jurisdiction—removal—onto an issue over which the Court has jurisdiction—a temporary injunction.

## II.  SafeLease's Removal Was Timely and Proper.

Defendants' merits challenges to removal fail for two cardinal reasons: *first*, SafeLease timely removed this action, as the Business Court correctly determined, CR0747-55; *second*, Defendants' "forum shopping" concerns are essentially disagreements with legislative policy embodied in the statutory text.

### A.  SafeLease timely removed the action within thirty days of commencing that action.

The Legislature has determined that "any party," not just defendants, may remove an action to Business Court. *See* TEX. GOV'T CODE § 25A.006. When, as here, the parties do not all consent to removal, the law imposes a time limit—30 days—that usually runs from the date the removing party "discovered or reasonably should have discovered, facts establishing the business court's jurisdiction over *the action*." *Id.* § 25A.006(f)(1) (emphasis added).

Defendants argue without analysis or authority that the removal clock started before SafeLease even filed its district court petition. Br. 17-24. Defendants insist that because SafeLease knew facts establishing Business Court jurisdiction before it sued, removal was never possible.

That argument makes a hash of the statute's text, and the practical implications of Defendants' argument belie its error.

## 1. Plain language confirms the Business Court's analysis.

The statute's language resolves the question. This Court effectuates the Legislature's intent as expressed through the words it enacts. *See ETC*, 707 S.W.3d at 926-28. Undefined words receive their ordinary, contemporaneous meaning, reading the statute as a whole and the words in their context. *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 718 (Tex. 2024); *In re Sanofi-Aventis U.S., LLC*, No. 15-24-00104-CV, 2025 WL 920111, at *1 (Tex. App.—Austin [15th Dist.] Mar. 27, 2025, no pet.).

Here, section 25A.006 exists to provide a specialized forum for complicated business disputes—like this one—outside of the general-jurisdiction district courts. *See generally* TEX. GOV'T CODE ch. 25A. The Legislature intended uniformity and clarity in rulings impacting businesses in Texas. *ETC*, 707 S.W.3d at 928-29. It therefore mandated that the Business Court issue written opinions to provide precedent and guidance on the law through coherent, reviewable legal reasoning. *See* TEX. GOV'T CODE § 25A.016. And it provided that all appeals from and original proceedings related to the Business Court must be heard in this

30

specialized appellate court. *Id.* § 25A.007. Critically, to promote use of the new Business Court and to direct appropriate matters to this Court for uniform treatment, the Legislature gave *both* plaintiffs and defendants the right of removal. *Id.* § 25A.006(f).

Courts presume that "the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted." *Sanofi-Aventis*, 2025 WL 920111, at *1. The Court must "give effect to all the statute's words" and avoid "treat[ing] any statutory language as mere surplusage." *Nguyen v. Watts*, 605 S.W.3d 761, 777 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *T.R.E.C. v. Marla Nunally Kaufman Homes, LLC*, No. 15-24-00030-CV, 2025 WL 409504, at *4 (Tex. App.—Austin [15th Dist.] Feb. 6, 2025, no pet.).

The statute must be construed as starting the removal clock when a plaintiff files its original petition in district court:

> A *party* may file an agreed notice of removal at any time *during the pendency of the action.* If all *parties* to the *action* have not agreed to remove the *action*, the notice of removal must be filed:
>
> (1) not later than the 30th day after the date the *party* requesting removal of the *action* discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the *action*; or

31

> (2) if an application for temporary injunction is pending on the date the *party* requesting removal of the *action* discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction over the *action*, not later than the 30th day after the date the application is granted, denied, or denied as a matter of law.

TEX. GOV'T CODE § 25A.006(f) (emphasis added). The words "party" and "action" are terms of art with "particular meaning[s]" in the law and must "be construed accordingly." *Id.* § 311.011(b).

A "party" can request removal. Unless a petition has been filed, there is no "action" to which any person or entity could be a "party." *Yilmaz v. McGregor*, 265 S.W.3d 631, 637 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Construing an analogous statutory deadline, the Houston Court of Appeals held that an expert-report-objection deadline cannot start until suit is brought because until then there is no "proceeding in which that objection could have been filed" or a "party" to file it. *Id.* (discussing *Poland v. Ott*, No. 01-07-00199-CV, 2008 WL 257382 (Tex. App.—Houston [1st Dist.] Jan. 31, 2008, no pet.)).

Likewise, because removal "simply *transfers* an existing [action]," *ETC*, 707 S.W.3d at 927, removal cannot occur until an action is "commenced"—*i.e.* a petition is filed—in district court. As the Business

32

Court correctly observed, CR0751-52, "action" means "a[] proceeding in a court of justice by which an individual pursues [a] remedy," *Zachry Eng'g Corp. v. Encina Dev. Grp.,* 672 S.W.3d 534, 539 (Tex. App.—Houston [14th Dist.] 2023, pet. abated). So a "party" cannot discover that an "action" is subject to the Business Court's jurisdiction, let alone remove it, if no "proceeding in a court" yet exists. *See* TEX. R. CIV. P. 22 (an action exists when "commenced by a petition"). It follows from the use of the terms "party" and "action" that the removal clock does not begin to run until a petition is filed.

The subsection's first sentence confirms this conclusion: "A party may file an agreed notice of removal at any time *during the pendency of the action.*" TEX. GOV'T CODE § 25A.006(f) (emphasis added). And that section also permits litigants flexibility to remove as matters progress. Thus, the language permitting removal within 30 days of discovery or constructive knowledge of "facts establishing the business court's jurisdiction" is not surplusage under SafeLease's interpretation. *See id*; *contra* Br. 27. Many actions may begin with an uncertain amount in controversy; parties may realize that their dispute meets the amount-in-controversy requirement only after filing. *Cf.* TEX. GOV'T CODE

33

§ 25A.004(d)(1), (2). In such cases, parties are not limited to the initial forum if they later discover facts to invoke the Business Court.

Defendants claim (at 25) that SafeLease's interpretation—that the removal clock begins no earlier than when a petition is filed—asks the Court to "add" language to the statute. To the contrary, SafeLease focuses only on the statutory words. Defendants fundamentally misunderstand the meanings of the terms "party" and "action"—that is, the Legislature's terms. No one is a "party" to an "action" that is unfiled. It is Defendants who invite this Court to change the statute's language by ignoring those words and their meanings. The Court should decline that invitation. *Sanofi-Aventis*, 2025 WL 920111, at *1; *T.R.E.C.*, 2025 WL 409504, at *4.

Defendants next argue that the Business Court's interpretation treats the term "action" inconsistently within the statute. Br. 26-27. The statute provides that, in addition to removal of "the action," "[a]n action within the jurisdiction of the business court may be filed in the business court." TEX. GOV'T CODE § 25A.006(a). As shown above, this language tracks the prospect of changed circumstances in litigation. And it makes sense that section 25A.006(a) refers to "an action"—in the abstract sense—that could be filed directly in Business Court, while section

34

25A.006(f) refers to "the action"—in a concrete sense—that already exists and is subject to removal. Similarly, a statute might provide that "*a* business" may be formed and mandate that "*the* business," once formed, must have bylaws. The Legislature's intentional grammatical choice, reflecting common usage, should not be disregarded.

Section 25A.006(a) uses the indefinite article "an," while section 25A.006(f) uses of the definite article "the." In the former, "an action" refers to something indefinite—"a nonspecific object, thing, or person that is not distinguished from the other members of a class." BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE 991 (4th ed. 2016). In the latter, "the action" refers to something specific—"a particular person or thing that [] is understood without additional description." *Id.* So section 25A.006(a) refers to a class of actions that can be initially filed in Business Court, while section 25A.006(f) refers to a particular action that already exists and governs its removal. Logically, a plaintiff can "file" "an action" (indefinite) and thereby "commence" it without it having previously existed. But the concept of "removing" and thereby "transferring" "the action" (definite) presupposes its existence.

35

Defendants (at 27) cherry-pick other phrases that they think the Legislature could have chosen to force litigants to file actions directly in Business Court instead of removing. But that attempt to short-circuit statutory text fails for the reasons noted in Parts II.A.2 and II.B, *infra.* And SafeLease does not need the removal clock to "reset," *contra* Br. 18, because it never started running until, at earliest, the district court petition was filed.

### 2. The impractical, ahistorical nature of Defendants' interpretation underscores its textual flaws.

The Legislature did not create a Business Court in vain. In Defendants' telling, the clock for removal begins at some unknown point *before* the action is filed. That interpretation radically curtails access to the Business Court (and this Court) and flouts both Texas and federal practice. Defendants identify no judicial systems that work like they suggest—because none does. Defendants' interpretation promotes gamesmanship and disincentivizes dispute resolution, assumes the Legislature included surplusage, would waste judicial resources, and inhibits both the Business Court and this Court in carrying out their intended purpose.

First, consider how Defendants' position would stymie a *defendant's* right to remove. In business-tort actions, a defendant would frequently have awareness, actual or constructive, of "facts establishing business court jurisdiction" when it committed the tort. However, many business-tort claims have a four-year limitations period. TEX. CIV. PRAC. & REM. CODE § 16.004. The plaintiff might thus discover the injury only later and could still wait years to file suit. If the plaintiff elects to file in district court, the statute places the onus on the removing party: the defendant in this scenario. But Defendants' proposed reading precludes removal *by the defendant* if a plaintiff waits more than 30 days after being injured to sue in district court. And a plaintiff could easily ensure this result by sending a demand letter—to guarantee the defendant's awareness—31 days before filing.

Second, Defendants assert that only the plaintiff can know what claims and damages he might bring before he sues. Br. 31. But that ignores the realities of dispute resolution and litigation. Defendants' interpretation, precluding removal of virtually all eligible cases to Business Court, whether by plaintiffs or defendants, contravenes statutory context and the Legislature's intent that high-dollar, complex

37

business disputes should be litigated and treated uniformly in specialist trial and appellate courts. *See* TEX. GOV'T CODE §§ 25A.004, 25A.006, 25A.007, 25A.016; *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 n.3 (Tex. 2023); *Jackson v. SOAH*, 351 S.W.3d 290, 295 (Tex. 2011). Indeed, Defendants' reading relies on this Court's interpreting the statute's discovery rule as *reducing*, rather than extending, the period that it modifies. In every other context, discovery rules work the opposite way: they defer the beginning of a period until some condition obtains. *See* 50 TEX. JUR. 3d § 51.

Third, Defendants argue (at 29-30) that the Legislature "wisely distinguished between" a plaintiff who discovers later that the Business Court has jurisdiction and a plaintiff who knows before filing in district court that he could have filed there. Because the latter plaintiff could have filed in Business Court to begin with, Defendants say, that plaintiff should be barred from removing. But the Legislature's intent is known by the words it uses. *See ETC*, 707 S.W.3d at 926-28. And the Court cannot rewrite the statute to effectuate Defendants' preferred result. *Carver*, 2025 WL 353105, at *3. In any event, Defendants' reading

impermissibly narrows the removal statute beyond recognition, even for *defendants*.

But the Legislature has determined that defendants have no special claim on Business Court access. It expressly permitted either party, not just defendants, to remove a case within 30 days of a district court's resolving a temporary injunction. TEX. GOV'T CODE § 25A.006(f)(2). Defendants' interpretation mangles this carefully chosen statutory choice as well. If the clock to remove an action begins to run before an action is brought, then it must also start to run before "an application for temporary injunction is pending." *See id*. Defendants conceded as much below. CR0493. This interpretation renders Section 25A.006(f)(2) meaningless, since as discussed above, plaintiffs and defendants will often have at least constructive knowledge of the Business Court's jurisdiction well in advance of suit. *Cf. Nguyen*, 2020 WL 2786841, at *9; *Crowley ISD v. Stoneham*, No. 15-24-00051-CV, 2025 WL 794046, at *7 (Tex. App.—Austin [15th Dist.] Mar. 13, 2025, no pet.) (courts do not presume the Legislature to "have done a useless act").

Further, when facts "establish" Business Court jurisdiction is not always a straightforward question. So under Defendants' interpretation,

39

the Business Court would have to make detailed findings as to the exact date that a litigant "discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction" in virtually every removed case. TEX. GOV'T CODE § 25A.006(f).

Texas law requires a plaintiff to conduct a "reasonable inquiry" to establish that "each allegation" has "evidentiary support or . . . is likely to have evidentiary support after a reasonable opportunity for further investigation." TEX. CIV. PRAC. & REM. CODE § 10.001; *see also Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 369 (Tex. 2014). And in any application for injunctive relief, each allegation must be verified under the threat of "a charge of perjury or false swearing." *In re MetroPCS Commcn's, Inc.*, 391 S.W.3d 329, 337 (Tex. App.—Dallas 2013, no pet.); *see also* TEX. R. CIV. P. 682.

Until these hurdles are cleared, a plaintiff cannot know whether Business Court jurisdiction is "established." Those determinations require evidence, not merely argument. It is therefore implausible that the Business Court could resolve most disputes regarding when parties knew or should have known certain facts about a potential case on the papers alone. *Contra* Br. 32. As this case demonstrates, the exercise will

frequently be more involved. And even removal by a defendant would frequently require evidentiary hearings regarding constructive knowledge. *Contra* Br. 31.

By following the federal practice of determining removability based on *pleaded* facts, after an action is instituted, *see* 28 U.S.C. § 1446(b), the Legislature's intent is preserved and the need for laborious evidentiary hearings and fact finding the Legislature never anticipated is avoided, *see generally* TEX. GOV'T CODE § 25A.006 (omitting any reference to such a hearing). Indeed, the Business Court statute was largely patterned on and borrows from parallel federal rules. Jack B. DiSorbo, *A Primer on the Texas Business Court*, 76 Baylor L.R. 360, 375-76 (2024). Of course, the Texas statute is broader and more forgiving, including by giving any party the right to remove and tolling the removal clock during the pendency of a TRO or temporary injunction. The federal statute explicitly runs the timeline from service of the pleading from which it appears that removal is proper, and the Texas statute does similarly by referring to "parties" to an "action." And SafeLease's interpretation leaves room for later-discovered facts and post-petition developments to also trigger the removal clock.

This case underscores the impracticality of Defendants' interpretation. They say SafeLease learned sufficient jurisdictional facts sometime "from October 15, 2024 to December 17, 2024." CR0490. Taking the earlier date, that means removal would be barred after November 14, 2024—even though Defendants did not block SafeLease's system access until a month later. CR0321. Accordingly, removal for both parties would have been improper any time after SafeLease filed its original petition.

In sum, Defendants' interpretation has a host of problems. It promotes gamesmanship in noticing and filing actions, inhibits alternative dispute resolution by forcing a race to the courthouse, renders part of the statute meaningless, hinders plaintiffs' duty to ensure the veracity of allegations, wastes judicial resources on unnecessary and legislatively uncontemplated fact-finding proceedings, and drastically narrows the class of cases the Business Court can hear in contravention of Legislative intent. Defendants' misunderstanding of the terms "party" and "action," their ignorance of the definite article "the," and their elision of other provisions establish that their position is riddled with textual errors; the practical and historical anomalies from that interpretation confirm those errors. This Court should reject that position.

## B. Defendants' forum-shopping concerns are misplaced.

Defendants argue that SafeLease's timely removal constitutes impermissible forum shopping and that the Business Court's order denying remand should be reversed. Defendants' complaints are little more than misdirected policy arguments that must be made, if anywhere, to the Legislature.

**1.** Much to Defendants' chagrin, Section 25A.006 does not contemplate "forum shopping" as a ground for remand. Nor does the Rule governing removal and remand. TEX. R. CIV. P. 355. And Defendants make no effort (at 33-39) to show the contrary. The Business Court correctly pointed out that other mechanisms exist to prevent and correct abusive litigation tactics when they arise. CR0753 (citing examples of sanctions upheld in abusive forum-shopping cases). The Business Court could prevent abuses by refusing to reconsider a district court's order or by imposing sanctions. But no such mechanisms are warranted here. Tellingly, Defendants have not invoked any existing remedy for purported "forum shopping."

Instead, the removal statute expressly contemplates SafeLease's litigation "tactics." *See* TEX. GOV'T CODE § 25A.006(f)(2). The Legislature

43

specifically permitted plaintiffs to remove after the denial of a temporary injunction. *Id.* Whether the Business Court should reconsider a failed temporary-injunction application after removal no doubt depends on the case's merits—but the Legislature plainly contemplated that possibility by allowing it by text, and Defendants cannot second-guess that decision.

This result—a party's entitlement to reconsideration of an order after removal—is hardly unfamiliar. Cases can be removed to federal court after a state court rules on a TRO application or even after temporary injunctive relief. *See* 28 U.S.C. § 1450 (providing injunctions "shall remain in full force" after removal). And for decades, defendants have had the option to remove and seek dissolution of state courts' temporary injunctive relief. *See, e.g., Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*, 415 U.S. 423, 428-29 (1974) (requesting a federal court dissolve a state court's TRO). Those reconsideration requests do not draw into question the integrity of defendants or courts.

**2.** Finally, Defendants' (irrelevant) complaints about "forum shopping" are misguided. Even if those arguments were relevant, the Court should give them no weight.

First, the procedure SafeLease employed does not "inject inefficiency." *Contra* Br. 33. Usually, the only way to obtain review of a denied temporary injunction is through interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014. And for review of a TRO, the aggrieved party must seek mandamus relief. *In re County of Hidalgo*, 655 S.W.3d 44, 55 (Tex. App.—Corpus Christi 2022, no pet.). In other words, there are already inefficiencies baked into the law—appellate review and mandamus review both take time and delay trial court proceedings. There is no efficiency to be gained by violating a party's right to remove and request reconsideration. In fact, removal and reconsideration are more efficient. And when, as here, the factual circumstances changed, removal and reconsideration are more appropriate. Indeed, that was the decision the Business Court referred to as "strategic," BC2RR31— SafeLease's decision to remove rather than appeal.[1]

---

[1] Defendants themselves sought reconsideration thrice—first of the district court's TRO, CR0077, and then of the Business Court's temporary injunction order, CSR004, and finally, by seeking "clarification" of the temporary injunction, CSR058.

And second, reversal is not necessary to prevent an impression that judges are partial. *Contra* Br. 34. Rather, courts uphold impartiality by applying the law correctly, as the Business Court did.

This case is unlike *Kelley v. Homminga*, 706 S.W.3d 829 (Tex. 2025). *Contra* Br. 36. There, the Supreme Court concluded that the plain language of the relevant statute did not give litigants the unfettered right to appeal any decision to this Court and that permitting such a right might lead to gamesmanship. 706 S.W.3d at 832-34. Here, SafeLease did exactly what the statute contemplates. Instead, it is Defendants who disregard *Kelley*. The Supreme Court was concerned that permitting nearly any appeal to this Court would, in contravention of legislative intent and statutory text, undermine this Court's ability to do the specialized work for which it was created. *Id.* at 834. Here, Defendants propose a reading of the removal statute that drastically narrows the courthouse door in contravention of both legislative intent and plain language.

Moreover, Defendants' complaints about reconsideration flout the longstanding rule that a trial court retains plenary power over interlocutory rulings until final judgment. *Bellamy v. Allegiance Benefit*

46

*Plan Mgmt., Inc.*, 696 S.W.3d 751, 761 (Tex. App.—Eastland 2024, no pet.). Plenary power means the trial court "retains continuing control over" its decisions and can reconsider them for any or even no reason. *See Fruehauf Corp. v. Carillo*, 848 S.W.2d 83, 84 (Tex. 1993). Particularly, a trial court can reconsider temporary injunctive relief for reasons including changed circumstances. *See Sonwalkar v. St. Luke's Sugar Land P'ship*, 394 S.W.3d 186, 195 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Defendants fail entirely to grapple with this principle in arguing that the Business Court was powerless to reconsider the district court's orders.

## III. SafeLease Was Entitled to Injunctive Relief.

SafeLease made every necessary showing for temporary injunctive relief, and this Court should not disturb the Business Court's discretion. A temporary injunction is a provisional remedy "to preserve the status quo of the subject matter of a suit pending final disposition of the case." *Combs v. Ent. Publ'ns, Inc.*, 292 S.W.3d 712, 724 (Tex. App.—Austin [3rd Dist.] 2009, no pet.). It does not "determine the respective rights of the parties"; it merely "preserve[s] the existing condition until a final hearing." *Watts v. Alto ISD*, 537 S.W.2d 776, 778 (Tex. App.—Tyler 1976,

47

no writ). "Because of this limited purpose," the trial court's discretion is "broad." *Combs*, 292 S.W.3d at 724.

SafeLease had to show "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Abbott v. Harris County*, 672 S.W.3d 1, 8 (Tex. 2023) (quoting *Butnaru*, 84 S.W.3d at 204). Defendants claim that SafeLease showed neither a probable right to relief (at 51-61) nor irreparable injury (at 40-50). Both arguments fail.

## A. SafeLease established a probable right to recover on its tortious-interference claim.

"An injunction plaintiff need not establish the correctness of his claim to obtain temporary relief, but must show only a likelihood of success on the merits." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990). SafeLease has done so. CSR0041-44. Defendants' forfeitures and faltering arguments cannot meet the high threshold of showing the Business Court abused its discretion in concluding as much. And, at bottom, this Court need ask only whether some evidence supports the Business Court's factual findings. *Edwards*, 252 S.W.3d at 836.

SafeLease pleaded a claim for tortious interference with contract and supported each element with legally sufficient evidence. Defendants

do not argue otherwise. Instead, Defendants claim they established the affirmative defense of justification. Br. 51-61. Defendants must therefore show any interference was the result of exercising their own legal rights or "a good faith claim to a colorable legal right." *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000). The Court should reject that argument for at least three reasons. For one, courts do not consider affirmative defenses when adjudicating temporary injunctions. For another, Defendants' defense is meritless as a matter of law. In any event, and as the Business Court's careful analysis shows, the defense fails as a matter of fact.

1. **The Court should disregard Defendants' affirmative defense at this stage.**

Justification is an affirmative defense for which the burden is on the defendant. *Id.* In other words, it is a defense of "avoidance," not denial. *Knox v. Taylor*, 992 S.W.2d 40, 59 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also* TEX. R. CIV. P. 94. Affirmative defenses go to the merits of the case and the plaintiff's ultimate right to recover. *Martin v. Dosohs I, Ltd.*, 2 S.W.3d 350, 354-55 (Tex. App.—San Antonio 1999, pet. denied); *Pipes v. Hemingway*, 358 S.W.3d 438, 446 (Tex. App.—Dallas 2012, no pet.).

49

Defenses of avoidance are disregarded when adjudicating temporary injunctive relief. *DeVillbiss v. West*, 600 S.W.2d 767, 768 (Tex. 1980). This Court should uphold that rule, as the courts of appeals consistently do. *See, e.g.*, *Fuel 2 Go, LLC v. Mesa Fortune, Inc.*, No. 01-21-00546-CV, 2023 WL 7029564, at *7 (Tex. App.—Houston [1st Dist.] Oct. 26, 2023, no pet.); *Grossman v. City of El Paso*, 642 S.W.3d 85, 110 (Tex. App.—El Paso 2021, pet. dism'd); *Hyde v. Aero Valley Prop. Owners Ass'n*, No. 02-20-00416-CV, 2021 WL 2460799, at *5-6 (Tex. App.—Fort Worth June 17, 2021, no pet.); *Magellan Terminal Holdings v. Vargas*, No. 13-19-00354-CV, 2021 WL 79351, at *2 (Tex. App.—Corpus Christi Jan. 7, 2021, no pet.); *Young Gi Kim v. Ick Soo Oh*, No. 05-19-00947-CV, 2020 WL 2315854, at *2 (Tex. App.—Dallas May 11, 2020, no pet.); *Williams v. Norwest Bank Mt.*, No. 09-99-096 CV, 1999 WL 651072, at *1-2 (Tex. App.—Beaumont Aug. 26, 1999, no pet.).

Defendants' defense must be addressed at "trial or through summary judgment proceedings." *Magellan*, 2021 WL 79351, at *3. Because Defendants "waive[d]" any challenge to the sufficiency of the evidence supporting the elements of tortious interference, *Jelinek*, 328

S.W.3d at 540 n.10, the Court must reject Defendants' arguments challenging SafeLease's right to recover.

### 2. The justification defense fails as a matter of law.

Furthermore, Defendants are precluded from asserting justification. When the methods of interference were "tortious in themselves," the justification defense is unavailable. *Choctaw Constr. Servs. LLC v. Rail-Life R.R. Servs., LLC*, 617 S.W.3d 143, 152 (Tex. App.—Houston [1st Dist.] 2020, no pet.). If the underlying act of interference is unlawful, the interference is tortious even if the defendant was exercising its own rights. *Knox*, 992 S.W.2d at 59. So Defendants cannot assert the defense if they accomplished their interference by "defamation, misrepresentation, [or] unfair competition." *Fin. Rev. Servs.*, 29 S.W.3d at 81 (quoting KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 992 (5th ed.1984)). They did.

While Defendants analogize (at 57) this case to *Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc.*, 49 S.W.3d 544 (Tex. App.—Austin [3rd Dist.] 2001, pet. dism'd), that case is inapposite. *Landry's* is irrelevant not least of all because it was not a temporary injunction case.

51

As discussed above, courts do not consider affirmative defenses in the temporary injunction analysis. But, moreover, it is factually distinct.

There, a company called Oyster had the right to sublease two abutting restaurant spaces. *Id.* at 546. One was occupied by "Hula Hut," operated by a company called Waterfront. *Id.* Waterfront's sublease provided that the restaurant in the other space had to be "of substantially different character." *Id.* When Landry's sought a deal with Oyster to open a "Joe's Crab Shack" in the abutting space, Waterfront initiated arbitration against Oyster, seeking a declaration that the two restaurants were not different enough. *Id.* The arbitrator agreed, and Oyster scuttled the deal with Landry's. *Id.* Landry's sued Waterfront for tortious interference, and the trial court granted Waterfront's summary judgment motion. *Id.*

Because the sublease provided the parties could submit any dispute to arbitration, *id.* at 550, Waterfront was entitled to seek clarification on whether Oyster would violate the contract between them by leasing the abutting space to Landry's. It was acting pursuant to its own rights vis-a-vis Oyster and was justified even though doing so incidentally

interfered with the Landry's-Oyster relationship. Seeking arbitration was not itself tortious or unfair competition.

This case is much more like *Financial Review Services*. There, the defendant had a contractual right to communicate about certain topics with policy holders and others. 29 S.W.3d at 81. "But that d[id] not mean [the defendant] could say or do anything under the guise of exercising a privilege." *Id.* The plaintiff put on sufficient evidence that the defendant disparaged its business. *Id.* at 81-83. That precluded the defendant from "establish[ing] its justification defense." *Id.* at 83.

Just so here. Defendants "intentionally interfere[d] with existing SafeLease customer contracts through exclusionary, anticompetitive, or otherwise wrongful means," and Defendants "ma[de] false or misleading representations about SafeLease to mutual customers." CSR0042. The Business Court thus found that Defendants misrepresented facts about SafeLease and engaged in unfair competition. CSR0042, 0045-46. Defendants do not challenge these findings, *see* Br. 51-61, which defeat Defendants' arguments against SafeLease's probable right to relief as a matter of law.

### 3. Defendants' contract-rights theory fails in any case.

Alternatively, Defendants' justification arguments fail on the facts. Defendants needed to show that their interference with SafeLease's contracts was "based on the exercise of [their] own legal rights." *Fin. Rev. Servs.*, 29 S.W.3d at 80. They did not. Here, Defendants assert a purported right to exclude SafeLease from their property (at 52-53) and that their terms of service provide three contractual bases to block SafeLease's access (at 53-60).

Based on three days of testimony, the Business Court concluded "[t]he evidence fail[ed] to show that Defendants' actions [were] justified or privileged." CSR0043. In doing so, it preliminarily weighed the evidence and made credibility determinations. CSR0042-44. Indeed, the court found Defendants' evidence to support their contractual arguments "not credible," CSR0042, and that the evidence did not show Defendants were "motivated by any alleged breach," CSR0044.

This Court views the record in the light most favorable to, and draws all reasonable inferences in support of, the Business Court's decision. *101 Lexington*, 678 S.W.3d at 296-97. If more than a scintilla of evidence supports the Business Court's findings, this Court cannot

disturb those findings. *Edwards*, 252 S.W.3d at 836. Preferring to focus on their own, competing evidence, Defendants cannot show error.

Defendants first claim an inherent property right to exclude SafeLease from their systems. They label that right "one of the most essential." Br. 53 (citing *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002)). *Krohn* examined the scope of a utility easement, a limited relinquishment of the right to exclude others from real property. *Id.* at 699-700. The Court recited the rules for enforcing and interpreting the relative rights of servient and dominant estates. *Id.* at 700-706. But whether a property owner may exclude others generally says nothing about whether he may do so for tortious reasons; after all, a business owner may fire an at-will employee for no reason at all, but he may not do so for an *unlawful* reason.

Defendants' terms of service belie their property-ownership arguments anyway. Those terms expressly permit customers' "Users" to "access and use" "the Services" and permit customers to "designate and authorize as many Users as [they] wish." CR0397. "Users" include customers' "employees, consultants, contractors and agents, and third parties with which [customers] transact business." CR0393. The

terms, therefore, articulate the rights of "dominant estate" holders—customers and their "Users"—vis-a-vis the "servient estate" holders—Defendants, who have partially relinquished the right to exclude. Defendants have already committed to providing access on specific terms; they cannot now retreat to an unqualified power to exclude anyone for any reason, let alone for tortious and monopolistic ones. Defendants may have "the right to charge for access to [their] FMS." Br. 52-53. But what matters is *who* they charge and *how* they exercise that right.

Defendants' next argument at least grapples with the contractual terms: they claim a right, under their terms of service, to block access that will "interfere with or disrupt the integrity or performance" of their services or "third-party data." Br. 53-55. They maintain SafeLease's access interfered with or disrupted the services by (1) causing instability and outages in the system, (2) exposing the private information of tenants, and (3) causing unidentified "problems" requiring unexplained "technical support."

The Business Court considered and weighed the parties' evidence and rejected each theory. CSR0042-44. The Business Court explained that "[a]ccess by SafeLease to customer-owned data in their FMS

56

systems . . . will create no imminent or likely risk of SafeLease data breach or misuse, nor of disruption to Defendants' server performance or stability," CSR0046, and that the evidence did not support "that SafeLease caused . . . [a] crash or . . . interruption of services," CSR0042. Likewise, it found that SafeLease did not "use[] spybots, engage[] in hacking, or . . . introduce[] malicious code or viruses." CSR0042. Defendants misapprehend the standard of review and merely argue that some evidence supports the factual findings they wish the Business Court had made. But they needed to show that *no evidence* supports the contrary findings the Business Court *did* make. *Edwards*, 252 S.W.3d at 836. They cannot.

For one thing, SafeLease put on evidence that Defendants ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████. BC5RR274-276. SafeLease's cyber technology expert testified he saw no evidence of any outage in April 2024, and the January 2025 outage happened when SafeLease was excluded from the FMS platforms. BC5RR276. A Storable executive confirmed the same, as reflected in Defendants' own public

57

incident report tracker. BC5RR251-53; PX178. And SafeLease's expert likewise testified that there was no inherent security risk arising from "front door" access that would not arise from API access. BC5RR277, 279-80. In any event, SafeLease uses industry gold-standard security protocols for handling all customer and tenant data. BC5RR32; PX48. The Business Court considered that evidence persuasive, conditioning the temporary injunction on SafeLease's maintenance of its SOC-2 certification. CSR0047.

Defendants also claim a contractual right to block SafeLease's access essentially because SafeLease is a vendor of the parties' mutual customers. Br. 56-57. But the Business Court, considering the evidence and its credibility, rejected those arguments. CSR0043-44.

Defendants say their customers agree to subscribe to FMS "solely for [their] internal business purposes." Br. 56 (quoting CR0397). But that is exactly what their customers do. Landlords offer insurance services to their tenants to compete in the self-storage market; it is an important revenue stream and a product their customers want. BC3RR205-09. And Defendants do not dispute that those landlords own the tenant data within the FMS. By allowing SafeLease to access that data to offer

58

insurance, those landlords use their own property—via their vendor, SafeLease—for their own internal business purposes. As SafeLease's CEO testified, the "actions that SafeLease takes on its customers' FMS" are "exclusively for the facility to run their business." BC5RR35. SafeLease cannot be "commercially exploit[ing]" the platform. *Contra* Br. 56-57.

Defendants attempt to distinguish "access by an accountant," who they say "perform[s] the operator's internal business." Br. 57. In doing so, they say they have a specific contractual right to exclude providers of "risk-management products" because they "otherwise profit from tenants." *Id.* But as the Business Court explained, CSR0044, the contract does not bear that out, and Defendants never show otherwise. As Rudkin testified, vendors like SafeLease perform functions on behalf of a facility owner that the owner cannot perform as effectively or at all. BC3RR229-30. Just as an accountant might be an independent contractor of a facility, so is SafeLease. *See* BC3RR215-16. And both "otherwise profit" from their relationships with those facilities and from their access to Defendants' platforms. *See* CSR0044. That does not change that they

59

both serve an internal business need of the facilities, relying only on customer-owned data within the platform.

Next, Defendants say any third-party use or any use "to develop a commercial product" "requires a separate third-party DEI [data exchange interface] agreement," like an API agreement. Br. 56 (quoting CR0398). But Defendants point to no evidence that SafeLease was "developing a commercial product." CSR0043. As SafeLease's CEO testified, SafeLease is not "developing a commercial product through access to [its] customers' FMS accounts" and is not "doing anything besides managing insurance"—"Our products are our insurance policies." BC5RR35-36. Plus, SafeLease did not need an API agreement because it could provide its services without one. The parties' mutual customers were entitled to and did authorize SafeLease as a User. CR0393, 0397; CSR0043. The contractual provision for certain "advanced DEI" rights, CR0398, is simply irrelevant, *contra* Br. 56, because SafeLease had no technical need for it—SafeLease has always operated without any DEI or API access.

Finally, Defendants argue they had a contractual right to block users who "circumvent or disable any security . . . features or measures." Br. 58. They say SafeLease "triggered this right" when it "engineer[ed]

60

several ways to circumvent restrictions on [SafeLease's] access to" the FMS. Br. 58. This argument fails because—even under Defendants' telling—all the disputed conduct occurred *after* Defendants started interfering with SafeLease's contracts. Br. 58-59.

Importantly, SafeLease's access to its customers' data within the FMS platforms is contractually permitted, routine, secure, and limited. BC3RR218, 266-67; BC5RR29-30, 32, 52-53, 102, 257, 268, 278-79. SafeLease accesses and uses FMS platforms the way any other vendor does for the parties' mutual customers, and nothing about SafeLease's access is out of the ordinary, as Defendants' CEO confirmed: "facilities can have an accountant" or "a property manager as an authorized user"; "there is nothing wrong with an accountant being an authorized user" for multiple facilities; and that decision is "up to the customer." BC3RR205, 215-16, 283-84, 294; BC5RR173-76. That access was neither hacking nor illegal. BC5RR277-78. And whether automated or manual, SafeLease's FMS access was gained through the same authentication method whereby SafeLease logged into the platform as an authorized user; SafeLease could see only the data the customer authorized it to see. BC5RR268-69.

Moreover, Defendants' factual assertions are incomplete or inaccurate. For example, Defendants say SafeLease used "non-SafeLease email addresses" "because of a concern that Storable would . . . block SafeLease accounts." Br. 58. SafeLease's CEO testified quite the opposite: "It would be silly to say one could hide simply by changing usernames or email addresses. SafeLease is mentioned throughout the insurance module." BC5RR52. Likewise, SafeLease's CEO did not testify that "SafeLease asked operators to give it new user accounts as quickly as Storable blocked its existing accounts." Br. 59. Rather, new accounts were "being deactivated about as quickly as they are being created," BC5RR13, the exact opposite of Defendants' claim. Defendants simply cannot show that no evidence supports the Business Court's findings.

Defendants' claim that SafeLease was engaged in deceptive trade practices as to tenants also makes no sense and is fatally underdeveloped. They baldly claim that SafeLease's use of its customers' data was somehow illegal. Br. 59 (citing TEX. BUS. & COM. CODE §§ 324.051, 324.055). The statutory provisions Defendants cite are facially irrelevant to this case. *See* TEX. BUS. & COM. CODE §§ 324.002, 324.051, 324.055 (governing the "use of zombies or botnets" to conduct

62

malicious activities). And, tellingly, Defendants make no attempt to analyze those statutes, nor did they raise them below. In any event, SafeLease's automations were not transmitting code into the FMS platforms, invading those platforms, or otherwise bypassing or corrupting anything about the platforms. BC5RR269. Instead, those automations run on *SafeLease's* systems and interact with the FMS platforms *like a human* would: by clicking buttons or otherwise interacting with the platform's interface. BC5RR269.

Likewise, Defendants assert without support that SafeLease's contracts with its own customers are illegal and void against public policy. Br. 60. Again, Defendants never explain how, nor did they raise that argument below. Any analysis of the relative rights of tenants, facilities, and SafeLease as to facility-owned data within the FMS platforms is entirely absent from Defendants' brief. This aside by Defendants should be ignored.

Because sufficient and substantial evidence supports the Business Court's factual findings with which Defendants take issue, and because Defendants' other arguments are nonsensical or underdeveloped, this

Court should affirm the temporary injunction even if it reaches these factual sufficiency questions. But as discussed above, the Court need not.

### 4. Defendants cannot prevail on a mere good-faith assertion of a colorable right.

Defendants cannot succeed by citing their good-faith assertion of a colorable right. Courts do not consider affirmative defenses at the temporary-injunction stage, so when a trial court identifies a merely colorable right mistakenly exercised, the *fact finder* must decide whether that colorable right was exercised in good faith. *Fin. Rev. Servs.*, 29 S.W.3d at 80. And there can be no "good faith" belief in a right to make false and misleading statements about another, as the Business Court found and as discussed above.

First, Defendants rely (at 60-61), without citing legal authority, on their CEO's belief in Defendants' "interference and disruption" and "commercial exploitation" arguments, which are dispelled above. And they rely on some unidentified, undescribed "presentation" they claim shows their right to exclude SafeLease. These arguments merely rehash factual disputes the Business Court resolved against Defendants; Defendants misunderstand the standard of review. The Business Court

found Defendants' actions were not motivated by any violation of the terms of service and their excuses were "not credible." CSR0044.

To surmount that finding—and the resulting legal conclusion that Defendants did not act in furtherance of a good-faith belief in a colorable legal right—Defendants needed to show that *no* evidence supported that finding, not that *some* evidence supported the opposite. *Butnaru*, 84 S.W.3d at 211; *Edwards*, 252 S.W.3d at 836. They cannot; they do not even try because ample evidence supported it.

For example, Defendants' CEO testified he had a long-standing line of communication with SafeLease's CEO but that he never told SafeLease's CEO he or Defendants thought SafeLease was violating Defendants' terms of service or harming the FMS platforms. BC5RR185-87. Defendants' CEO also testified Defendants had not told the parties' mutual customers they or SafeLease were violating the terms of service. BC5RR221. Viewing the record in the light most favorable to the Business Court's decision, *101 Lexington*, 678 S.W.3d at 296-97, that alone is sufficient evidence on which the Business Court could have rejected Defendants' good-faith argument.

Second, Defendants rely on a separate company's efforts to block SafeLease from access to its FMS under separate contracts and facts. Br. 61. But a different company's interpretation of its own, very different contract (which does *not* allow customers to designate other authorized users, DX177) cannot support a claim that Defendants had a good-faith basis to exclude SafeLease under Defendants' contracts. Likewise, what an "unaffiliated risk-management-product vendor"—*i.e.*, a SafeLease *competitor*—believes about the propriety of SafeLease's conduct says nothing about Defendants' contractual rights. *Contra* Br. 61. The Court should affirm.

## B. The Business Court did not abuse its discretion in finding irreparable injury.

Defendants complain (at 40-50) that SafeLease did not show irreparable injury. Defendants are wrong for two reasons. First, Defendants ignore, and thus waive any challenge to, multiple findings that SafeLease faces irreparable injury. Second, and in any event, Defendants fail to show the Business Court abused its discretion in concluding as much.

1. **Defendants ignore multiple grounds supporting the Business Court's findings.**

The Business Court made numerous unchallenged findings that SafeLease faces grave, irreparable injury absent a temporary injunction. An injury is "irreparable" when money damages will not adequately compensate for it or when "the damages cannot be measured by any certain pecuniary standard." *Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024).

The Business Court detailed the irreparable injury SafeLease faces. CSR0044-46. It explained that, without FMS access, SafeLease cannot "issu[e] contracted-for new or renewed policies," provide lease compliance services, provide data visualization services to customers, issue "required tenant notices [and] bill[s]," or "promptly and fully adjust[] tenant claims for loss." CSR0045. Put differently, SafeLease can neither "practicably perform its contractual obligations to the parties' mutual clients" or tenants nor operate as an insurer. CSR0045.

These impediments are "likely to permanently damage SafeLease's customer relationships and reputation and goodwill in the industry, as well as put customers at risk of disruption or loss." CSR0045. Thus, SafeLease "likely will be unable to continue operating or competing in

the tenant-insurance market." CSR0046. Any pecuniary harm "will be extremely difficult, if not impossible, to accurately identify, trace, quantify, and prove with reasonable certainty." CSR0046. Indeed, without relief, Defendants' actions "may prevent the case from reaching a final resolution on the merits." CSR0045.

Defendants fail to attack several of the Business Court's irreparable-injury findings and "waive[d]" any challenge to them. *See Jelinek*, 328 S.W.3d at 540 n.10; *In re M.A.S.*, 233 S.W.3d 915, 924-25 (Tex. App.—Dallas 2007, pet. denied). That failure is sufficient for this Court to affirm.

Moreover, the Business Court did not abuse its discretion with respect to these unchallenged findings because they are supported by legally sufficient evidence. *First*, the Business Court found that SafeLease would face irreparable injury because it would be unable to fully comply with its duties to insureds. CSR0041-42, 44-46. A party faces irreparable harm when a defendant's actions would impede performance of required duties. *See, e.g., Florie v. Reinhart*, No. 01-16-00603-CV, 2017 WL 817166, at *12-13 (Tex. App.—Houston [1st Dist.] Mar. 2, 2017, no pet.).

As SafeLease's CEO testified, SafeLease operates as a regulated insurer and faces "strict obligations as an insurance producer" to provide necessary tenant notices and lease language, but Defendants have interfered with that process. BC5RR19-20. SafeLease manages hundreds of millions of dollars of risk, but Defendants' actions cut off its ability to comply with regulatory obligations and created a risk of uninsured losses. BC5RR18, 24. Without a temporary injunction, SafeLease "likely will be unable to continue operating or competing in the tenant-insurance market." CSR0046.

*Second*, without an injunction, Defendants will likely harm SafeLease's "customer relationships and reputation and goodwill in the industry, as well as put customers at risk of disruption or loss." CSR0045. "Threatened injury to a business's reputation and good will with customers is frequently the basis for temporary injunctive relief." *Intercontinental Terminals Co. v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895-96 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (collecting cases); *RenewData Corp. v. Strickler*, No. 03-05-00273-CV, 2006 WL 504998, at *16 (Tex. App.—Austin [3rd Dist.] Mar. 3, 2006, no pet.). ███████

███████████████████████████████████████████████

█████████████████ BC3RR324. SafeLease was continually "putting out fires with customers" and it was "a ticking time bomb" until SafeLease lost the rest of its customers. BC4RR16. Tellingly, Defendants actively encouraged SafeLease's customers to switch to an alternative aligned with Defendants, PX147-004, confirming SafeLease's evidence that no interim solution could make up for the death blow Defendants intended by cutting off SafeLease's "access." BC4RR17.

These unchallenged aspects of irreparable harm are independently sufficient to support the Business Court's injunction.

### 2. Defendants fail to show any abuse of discretion in finding that SafeLease faced irreparable injury.

Defendants show no abuse of discretion on the narrow grounds actually challenged.

**a.** Defendants first say that SafeLease's arguments boil down to wanting to pay less for API access and wanting to avoid hiring more staff to conduct its business without access. That does not remotely encompass the harm SafeLease has shown, as discussed above. And the Business Court did not rest its decision on either harm. CSR0044-46. Yet again, Defendants fail to grapple with the relevant findings and evidence.

*First*, whether courts could award SafeLease the difference between a lawful rate and what Defendants wish to charge SafeLease is irrelevant. On one hand, the immediate financial harm to SafeLease that might flow from an anticompetitive API agreement is not the sole harm that would flow from Defendants' continued, illegal exclusion of SafeLease from the FMS platforms. SafeLease maintains, as the Business Court understood, CSR0043-46, that it is entitled to act as a customer-authorized User of the FMS platforms to access customer-owned data to serve customers. Defendants' terms of service do not prohibit that access; an API agreement is not necessary at any price.

On the other hand, and in view of SafeLease's position that it can legally access customer-owned data absent Defendants' interference, forcing SafeLease to enter a coerced API agreement is no solution at all. This is not a mere "lost rent" case. For example, in *Camp Mystic, Inc. v. Eastland*, 399 S.W.3d 266, 274 (Tex. App.—San Antonio 2012, no pet.), which Defendants cite (at 41), minority shareholders claimed the majority shareholder violated duties to the entity by leasing property— to another entity he owned—for a rent below market value. The court explained the difference between the rent paid was simply a matter of

71

money damages in the underlying suit—the court did not even need to explain that it was susceptible to proof. *Id.* Put differently, that case at most shows that forcing SafeLease to enter an API agreement will *increase* its damages, not render them reparable.

*Second*, Defendants argue that all SafeLease had to do was hire more staff to effectuate a workaround acceptable to Defendants—obtaining customer-owned data that resides within the FMS from the customers, rather than directly from the FMS. As the Business Court found, that is no real solution. SafeLease "cannot practicably perform its contractual obligations" that way, and that option is not a "viable solution." CSR0045.

That Defendants must spend five pages (at 41-46) to claim their solution is simple refutes itself. Defendants would require SafeLease to abandon its innovative business model, restructure how it interacts with customers and tenants, and provide fewer or less useful insurance services. As SafeLease's CEO testified, SafeLease cannot avoid one financial irreparable harm by running headlong into another irreparable harm via loss of control over its own customer relationships. *See* BC5RR13-26.

While SafeLease hired temporary workers to try to stay afloat, without FMS access it could not do so. BC4RR17-18; BC5RR15. Ensuring compliance with lease terms requiring insurance is one of SafeLease's primary services. BC4RR18-20; BC5RR15-16. But without FMS access, that service "can't be done at all" and SafeLease is "in breach of all our contracts with our customers that expect us to fulfill that service." BC5RR15. Nor can SafeLease enroll units in insurance or process opt-outs. BC4RR19-21; BC5RR18-19. Consequently, SafeLease was in breach of "all of our Auto-Protect contracts" and precluded from a "key part of compliance" for tenant coverage. BC5RR18-19. Defendants' actions risked uninsured tenant losses "in the thousands of units." BC5RR18. SafeLease likewise cannot enroll new tenants, process opt-outs, or send required notices. BC5RR18-20. And customers are forced to provide material assistance for tasks such as collecting data for claims adjustment and billing tenants, devaluing SafeLease's services. BC5RR24-25.

SafeLease relies on up-to-date FMS access for tenant information to manage hundreds of millions of dollars of risk. BC5RR24. SafeLease cannot replace lost customer trust and confidence in that system by

73

merely hiring more people or getting information a different way. As SafeLease's Chief Revenue Officer testified, "[e]very day since we have been deactivated" is like a "ticking time bomb" trying to "salvage customer relationships"; "we can hire a million people," but without access "there is nothing for them to do." BC4RR16-17. Rather, the significant operational challenge and financial risk posed by Defendants' conduct harmed SafeLease's trust and customer retention. BC3RR303-04; PX67.

Without engaging with those issues, Defendants again reference *Camp Mystic*. That case remains inapposite. There, the minority shareholders also claimed the lease unreasonably restricted their access to real property. 399 S.W.3d 275-76. The alleged injury was "one of convenience" and that "while it was inconvenient for [the minority shareholders] to access or hunt on the property," they were "not denied use of the property." *Id*. Common sense dictates that forcing a business to retool its operations entirely is not the same as making hunters pick a different weekend.[2]

---

[2] Defendants mistakenly cite *Canadian Helicopters Ltd. v. Wittig*, 876 S.W.2d 304, 306 (Tex. 1994), which merely explains the mandamus standard, *i.e.*, that additional "expense or delay" is insufficient to render *appellate remedies* inadequate.

*Third*, Defendants (at 45-46) fail to rebut the irreparable harms SafeLease still faces even if it could "afford" to survive through trial by providing fewer or worse services. The resulting goodwill and reputational losses are irreparable. And the ultimate "loser would be the customer." BC4RR249. A trial court does not abuse its discretion by resolving conflicting evidence against the non-movant. *Butnaru*, 84 S.W.3d at 211. Defendants thus cannot relitigate this issue under the guise of costs.

The Court should reject any notion that tracking losses of discrete customers could adequately account for SafeLease's harm. SafeLease's CEO testified about the importance of trust in the insurance market and the resulting harm to SafeLease's goodwill that Defendants caused: The "industry is quite small," and SafeLease "spent a lot of time trying to build" trust, so "when someone loses trust in someone in the insurance industry, that can unravel very quickly," which is happening because of Defendants' false claims that SafeLease is "hack[ing]" or doing "malicious activities." BC5RR56-57. This has been "very harmful" to SafeLease's "reputation and goodwill." BC5RR57. Defendants cannot ignore the reality that significant operational challenges and financial risk will

75

cause customer losses to mount. *See* BC3RR303-04, 324; BC4RR16; BC5RR26; PX67, PX170. Defendants exacerbated the harm by informing SafeLease's customers that it blocked SafeLease's FMS access for purported "security" and "privacy" reasons. PX147-002-03. Defendants' proposed workaround (to force SafeLease to burden customers and get needed information elsewhere) is thus doubly harmful: it kills SafeLease as a one-stop-shop, which is "the biggest reason that people work with [SafeLease]," BC3RR306, and plays into Defendants false narrative that SafeLease is untrustworthy and unsafe.

These harms are thus not "speculative." *Contra* Br. 45-46. Rather, Defendants simply waive any challenge to the consequences of customer loss for SafeLease's business reputation and customer trust. *See supra* Part III.B.1. If anything, it is Defendants who speculate about the supposed ability to mitigate harm: SafeLease's CEO confirmed that SafeLease was "entirely reliant on FMS" for necessary customer interactions and lacked a workaround. BC5RR123.

**b**. Defendants likewise fail to show any abuse of discretion regarding that SafeLease faced bankruptcy. *Contra* Br. 47-49. Testimony confirmed that SafeLease "would need to go out of business" if it had to

76

pay Defendants' exorbitant API fees. BC4RR248. Interference with continued business operations is quintessential irreparable harm. *GTE Mobilnet of S. Tex. Ltd. v. Cellular Max, Inc.*, 123 S.W.3d 801, 804 (Tex. App.—Beaumont 2003, pet. dism'd). As an initial matter, the Business Court could not have abused its discretion because its irreparable-injury findings do not rest on the likelihood of bankruptcy. *See* CSR0040-48.

The record supports the threat to SafeLease in any event. After Defendants blocked access, SafeLease lost 12 customers, representing some 15,000 units, between January 21 and February 14. BC5RR26; PX170. Without an injunction, ████████████████████████ ███████████████████ and it was merely a "ticking time bomb" until SafeLease lost its remaining customers. BC3RR324; BC4RR16.

**c**. Similarly, the record belies Defendants' argument that an absence of irreparable injury was somehow "*conclusively established.*" Br. 49-50. Defendants say the record reflects SafeLease's ability to pay a bond and obtain credit, so it cannot possibly experience an irreparable harm. Defendants did not make this argument below and so cannot raise it for the first time here. *See* CR0956-59. Moreover, while SafeLease *initially* posted a cash bond, CR0950, secured from a *family* loan, it

77

immediately informed the Business Court that it would obtain a surety, CR0953. Twenty days later SafeLease obtained that surety, CSR0081, and just one week later, SafeLease moved to substitute the surety bond for its cash deposit, CSR0086. That SafeLease could temporarily scrape together the cash deposit does not mean it can withstand further injury.

SafeLease's CEO testified that the company has enough liquidity for "probably a couple of months of payroll." BC5RR128. But without "customer trust in the financial services business, it doesn't matter how much money you have in the bank; you will not have business." BC5RR57. Unequivocal testimony established that "to survive," SafeLease "need[ed its] access back. We need to be able to fulfill our contracts with our customers, and we need to make sure that all of these false statements against us stop." BC5RR57-58. Liquidity is no substitute for interference with SafeLease's "fulfill[ing] what our customers pay for us to do, which is administer their insurance programs." BC5RR58.

## IV. Defendants' Remaining Arguments Fail.

### A. The Business Court correctly rejected Defendants' unclean-hands defense.

Defendants contend SafeLease came to court with unclean hands. As Defendants recognize (at 62), that doctrine is part of the trial court's

78

consideration of the equities. It is an affirmative defense, *see Cantu v. Guerra & Moore, LLP*, 448 S.W.3d 485, 496 (Tex. App.—San Antonio 2014, pet. denied), and for the reasons in section III.A.1, *supra*, the Court should disregard it.

The party asserting the defense must "ha[ve] been seriously harmed," showing that the wrong "cannot be corrected without applying the doctrine." *Id.* The determination "is left to the discretion of the trial court." *Wynne v. Fischer*, 809 S.W.2d 264, 267 (Tex. App.—Dallas 1991, writ denied). Defendants never attempt to meet that high burden: they never demonstrate how SafeLease harmed them, let alone "seriously," or how such harm (if any) can be ameliorated *only* through the unclean-hands doctrine. That failure alone guts their argument.

The unclean-hands argument is meritless for other reasons. Defendants insist, for example, that "SafeLease deliberately built its business model to rely on free access to Storable's FMS." Br. 62. The Business Court rejected that notion, noting that Defendants never identified any support for using "an alleged right to prevent free riders" to defeat a tortious-interference claim. CSR0044. Defendants' briefing here fares no better.

The Business Court likewise rejected unfounded arguments that SafeLease circumvented Defendants' security measures or misled customers. CSR0042. And Defendants' argument (at 63) that SafeLease has unclean hands because it exercised its statutory removal prerogative is not serious. Defendants' cases do not involve temporary injunctions, let alone injunctions based on a detailed evidentiary record like here. *E.g.*, Br. 63 (citing *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988), involving a jury trial and quantum meruit).

The Business Court was well within its discretion to reject the unclean-hands argument. Defendants are wrong that the Business Court "fail[ed] to address" the issue. Br. 64. The court found that "the balance of equities favors issuance of injunctive relief," rejected the evidentiary contentions undergirding Defendants' unclean-hands argument, and concluded that *Defendants* acted inequitably when, "with no advance customer permission or notice, Defendants cut off SafeLease's access to the storEDGE platform" and later "cut off SafeLease from access to all three of their FMS systems." CSR0045-46. Ignoring those findings, Defendants cannot prevail.

## B. The temporary injunction is prohibitive, not mandatory.

Finally, Defendants suggest that the temporary injunction is mandatory, not permissive, and was therefore subject to a higher—and allegedly unmet—burden. The Court can disregard that argument for three reasons. First, Defendants did not raise it below (and do not assert otherwise here) and therefore failed to preserve it for appellate review.

Second, Defendants neither explain the heightened evidentiary standard they claim applies nor analyze the record or the Business Court's order vis-a-vis that standard. Instead, Defendants baldly state that SafeLease failed that standard. Br. 64-65. That deficit "waives" the argument and should end the analysis. *Jelinek*, 328 S.W.3d at 540 n.10.

And third, the injunction is plainly prohibitive, mandating no affirmative action. A prohibitive injunction preserves the status quo and forbids conduct. *Tex. Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 214-15 (Tex. App.—Fort Worth 2021, no pet.). Here, the injunction provides that "***Defendants shall take no action*** to prevent, impede, or otherwise interfere with SafeLease's authorized-user access." CSR0047 (emphasis added). This injunction preserves the status quo by allowing

81

SafeLease to continue accessing FMS systems as it did for years before the dispute.

An incidental requirement to comply with an otherwise prohibitive, status-quo-preserving injunction does not make that injunction mandatory. *Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 592-93 (Tex. App.—El Paso 2003, pet. denied). The *Tri-Star* injunction required a project-operator defendant had to "take some affirmative action" to allow the plaintiff to "assume operation" of the project. *Id.* But that did not make the injunction mandatory because its purpose was to "prohibit[ the defendant] from interfering with [the plaintiff's] assumption of control." *Id.*; *see also Universal Healthcare Servs., Inc. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App.—Austin [3rd Dist.] 2000, no pet.).

The injunction here is similar: it may incidentally prompt some "action" from Defendants but is inherently prohibitive. Defendants merely must do what they were doing *before* they blocked SafeLease's FMS access, *contra* Br. 64, namely, return to the status quo.

## PRAYER

The Court should affirm.

82

Respectfully submitted.

June 6, 2025

/s/ *Judd E. Stone II*
JUDD E. STONE II
  State Bar No. 24076720
CHRISTOPHER D. HILTON
  State Bar No. 24106403
MICHAL R. ABRAMS
  State Bar No. 24087072
CODY C. COLL
  State Bar No. 24116214
ALEXANDER M. DVORSCAK
  State Bar No. 24120461
**STONE HILTON PLLC**
600 Congress Ave., Suite 2350
Austin, Texas 78701
judd@stonehilton.com
chris@stonehilton.com
michael@stonehilton.com
cody@stonehilton.com
alex@stonehilton.com
(737) 465-7248

*Counsel for Appellee*

## CERTIFICATE OF SERVICE

On June 6, 2025, this document was served on counsel for all parties, via the Court's electronic filing system. On June 6, 2025, I served an unredacted version of this document on Dale Wainwright, lead appellate counsel for Appellants, via email to dale.wainwright@gtlaw.com.

*/s/ Cody C. Coll*
Cody C. Coll

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this document contains 14,961 words, excluding exempted text.

*/s/ Cody C. Coll*
Cody C. Coll

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rosalinda Luna on behalf of Judd Stone
Bar No. 24076720
rosie@stonehilton.com
Envelope ID: 101739571
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief for Appellee
Status as of 6/6/2025 5:03 PM CST

Associated Case Party: SafeLease Insurance Services, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Delonda Dean | | ddean@yettercoleman.com | 6/6/2025 4:37:21 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/6/2025 4:37:21 PM | SENT |
| Cody Coll | | cody@stonehilton.com | 6/6/2025 4:37:21 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/6/2025 4:37:21 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/6/2025 4:37:21 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/6/2025 4:37:21 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/6/2025 4:37:21 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/6/2025 4:37:21 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/6/2025 4:37:21 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/6/2025 4:37:21 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/6/2025 4:37:21 PM | SENT |
| R. Paul Yetter | | pyetter@yettercoleman.com | 6/6/2025 4:37:21 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/6/2025 4:37:21 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/6/2025 4:37:21 PM | SENT |

Associated Case Party: Storable, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/6/2025 4:37:21 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/6/2025 4:37:21 PM | SENT |
| Ray Torgerson | | rtorgerson@porterhedges.com | 6/6/2025 4:37:21 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/6/2025 4:37:21 PM | SENT |
| Jonna Summers | | jsummers@porterhedges.com | 6/6/2025 4:37:21 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rosalinda Luna on behalf of Judd Stone
Bar No. 24076720
rosie@stonehilton.com
Envelope ID: 101739571
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief for Appellee
Status as of 6/6/2025 5:03 PM CST

Associated Case Party: Storable, Inc.

| Jonna Summers | | jsummers@porterhedges.com | 6/6/2025 4:37:21 PM | SENT |
|---|---|---|---|---|
| Lakshmi Kumar | | lkumar@porterhedges.com | 6/6/2025 4:37:21 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/6/2025 4:37:21 PM | SENT |
| Liza Eoff | | leoff@porterhedges.com | 6/6/2025 4:37:21 PM | SENT |
| Neil KentonAlexander | | kalexander@porterhedges.com | 6/6/2025 4:37:21 PM | SENT |
| Cathy Hodges | | catherine.hodges@aporter.com | 6/6/2025 4:37:21 PM | SENT |